STATE OF NORTH CAROLINA v. ELI ALVAREZ

No. COA04-521

(Filed 15 February 2005)

## 1. Homicide— first-degree murder—short-form indictment—constitutionality

A short-form indictment used to charge defendant with first-degree murder is constitutional.

## 2. Jury— peremptory challenges—*Batson* challenge—race-neutral reasons

The trial court did not err in a double first-degree murder, first-degree kidnapping, and robbery with a firearm case by denying defendant's *Batson* challenge to the State's exercise of a peremptory challenge to remove a prospective African-American juror, because sufficient race-neutral reasons for the State's challenge to the prospective juror were presented to comply with *Batson* including that: (1) the prospective juror's responses on the death penalty questionnaire were weak; (2) she admitted she might develop sympathy toward defendant; and (3) she made a misrepresentation on her juror questionnaire.

## 3. Identification of Defendants— photographic identification—discrepancies

The trial court did not err in a double first-degree murder, first-degree kidnapping, and robbery with a firearm case by denying defendant's motion to suppress a photographic identification,

STATE v. ALVAREZ

[168 N.C. App. 487 (2005)]

because: (1) although defendant argues several instances that question the validity of the witness's identification, her interaction with defendant both on 10 February 2001 and 11 February 2001 supports her identification; (2) the witness was in the driver's seat of the pertinent car when defendant yelled at her to open the door, banged on the window, and shot out the driver's side window; and (3) the discrepancies cited by defendant do not render the identification impermissible, but are for the jury to weigh and consider in determining the witness's credibility.

**4. Evidence— prior crimes or bad acts—robberies**

The trial court did not abuse its discretion in a double first-degree murder, first-degree kidnapping, and robbery with a firearm case by denying defendant's motion to suppress evidence of prior robberies, because: (1) the robberies were sufficiently similar in how they were committed and occurred within weeks of each other; (2) the State proffered testimony that the robberies were all part of a common scheme or plan toward a drug transaction with a Connecticut gang; and (3) prior to the introduction of testimony concerning the robberies, the trial court cautioned and instructed the jury to consider the evidence only for the limited purpose of showing an alleged common scheme, and the trial court again provided this limiting instruction when it charged the jury prior to deliberations.

**5. Evidence— limitation on cross-examination—coparticipant's pending charges**

The trial court did not abuse its discretion in a double first-degree murder, first-degree kidnapping, and robbery with a firearm case by allegedly limiting the cross-examination of defendant's coparticipant concerning pending charges against him, because: (1) the only instances where the trial court sustained the State's objections during defendant's cross-examination occurred after defendant had asked the witness about third-party statements offered for the truth of the matter asserted; (2) other testimony was admitted regarding the witness's penal interest in defendant's case; (3) the jury instructions specifically pointed to the potential bias concerning the witness's testimony against defendant; and (4) the record did not disclose any voir dire or offers of proof submitted by defendant's counsel following the trial court sustaining the State's hearsay objections of what the witness's answers would have been.

**6. Constitutional Law— effective assistance of counsel— alleged concession of guilt**

Defendant was not denied effective assistance of counsel in a double first-degree murder, first-degree kidnapping, and robbery with a firearm case based on his counsel allegedly conceding defendant's guilt twice during the closing argument to the jury, because: (1) taken in context with counsel's closing argument that all events arose in a drug deal gone bad, the concession that defendant was the getaway driver related to an intended drug deal, not a murder, and was the crux of defendant's argument throughout trial; (2) the other pertinent comment that if the jury found defendant not guilty of going to the victim's residence to commit an armed robbery, "you will find him guilty of everything else or not guilty of everything else" merely spoke to the charges involved and the resulting practical implications rather than being a reference to or indication of defendant being guilty of the crimes charged; (3) neither attorney conceded defendant's guilt to the crimes charged or to any lesser-included offense; and (4) defendant failed to show that his counsels' performance was so deficient that they were not acting as counsel for defendant and that the deficiencies complained of deprived defendant of a fair trial.

**7. Homicide— first-degree murder—failure to instruct on lesser-included offense of involuntary manslaughter**

The trial court did not err in a double first-degree murder case by failing to provide a jury instruction on involuntary manslaughter because when a jury is properly instructed on the elements on first-degree murder and second-degree murder and thereafter returns a verdict of first-degree murder based on premeditation and deliberation like in the instant case, any error in the trial court's failure to instruct on involuntary manslaughter is harmless even if the evidence would have supported such an instruction.

Appeal by defendant from judgments entered 1 April 2003 by Judge Melzer A. Morgan, Jr., in Forsyth County Superior Court. Heard in the Court of Appeals 25 January 2005.

*Attorney General Roy Cooper, by Special Deputy Attorney General David Roy Blackwell, for the State.*

*Paul Pooley, for defendant-appellant.*

TYSON, Judge.

Eli Alvarez ("defendant") appeals from judgments entered after a jury found him to be guilty of: (1) two counts of first-degree murder; (2) first-degree kidnapping; and (3) robbery with a firearm. We find no error.

## I. Background

The State's evidence tended to show Robert E. Sanchez ("Sanchez"), Juan Suarez ("Suarez"), and defendant met in January 2001. Defendant and Sanchez were both members of the "Latin Kings," a Puerto Rican gang. Sanchez, Suarez, and defendant discussed various crimes they planned to commit. One possible crime involved robbing Jose Luis Vera ("Chepa"), a well-known drug dealer who dealt in large amounts of contraband. The three men obtained information that Chepa may live in an apartment complex located on Timlic Avenue in Winston-Salem, North Carolina. They traveled there on the night of 11 February 2001 to find him.

Defendant, Suarez, and Sanchez arrived at the apartment complex and observed a black Honda in the parking lot. Defendant "just flipped" and ran towards the car.

Gustavo Saguilan Ventura ("Gustavo"), Noe Silva ("Noe"), Felipa Ayona ("Felipa"), Noelina Ayona ("Noelina"), and Ader Gonzalez ("El Flocco") had planned to go to a dance club on the night of 11 February 2001. Felipa drove Gustavo, Noe, and Noelina in a black Honda to pick up El Flocco, who lived in an apartment on Timlic Avenue.

While Felipa, Gustavo, Noe, and Noelina waited for El Flocco in the parking lot, defendant, Sanchez, and Suarez attacked the car. One of the attackers "spoke Puerto Rican" and told them to get out of the car. He hit the driver's side window with a gun, but it did not break. He then aimed the gun at the window, fired the gun, and shattered the window. Felipa backed the Honda away from the men and drove to Chepa's house on Marne Street.

After Felipa drove the black Honda away from the scene, defendant ran towards El Flocco as he emerged from his apartment. Defendant held El Flocco at gunpoint while Suarez and Sanchez ransacked his apartment. After El Flocco told defendant where Chepa lived, the assailants forced El Flocco into their car and drove to Chepa's house.

Vincenta Marin Cruz ("Cruz") and her husband, Chepa, were present at their house on Marne Street the night of 11 February 2001, along with Bernarda Marin, her husband, Ignacio Clemente, and their two daughters. At approximately 9:00 p.m., Felipa, Ventura, Noe, and Noelina arrived at Chepa's house nervous and scared. They explained what occurred at El Flocco's apartment. Ignacio Clemente looked out the window and saw three men walking toward the house with El Flocco. Chepa told everyone to get in a back bedroom and call the police. Cruz gave Chepa an "AK-47 rifle" before he left the bedroom to confront the three men.

Defendant and Sanchez, both armed, led El Flocco up to Chepa's front door. Sanchez kicked in the door to find Chepa standing in the hallway holding the rifle. Sanchez dropped to the floor. Defendant, while using El Flocco as a human shield, fired multiple times hitting Chepa.

While in the bedroom, Ventura heard gunshots and Chepa cry out that he had been shot. Cruz called the police, then passed the phone to Felipa who provided the street address to the dispatcher.

After defendant shot Chepa, Sanchez grabbed Chepa's rifle and ran out of the house towards their car. Defendant led El Flocco through the house to the back door, then "emptied his clip" into El Flocco, killing him. Sanchez and Suarez had driven away and met with defendant later.

Winston-Salem Police Officers Livingstone and Branshaw both responded to a "shots fired call" on Marne Street shortly before 9:00 p.m. Officer Livingstone arrived at Chepa's home just after 9:00 p.m. Officer Branshaw was already on the scene. Officer Livingstone observed a black Honda with a shattered window parked near the street, and spent brass shell casings on the steps and front porch. He entered the living room through the open front door and saw Chepa's body lying in the hallway. Officer Branshaw informed Officer Livingstone that he found El Flocco's body near the back door. Cruz, Bernarda Marin, Ignacio Clemente, Marin and Clemente's two daughters, Felipa, Ventura, Noe, and Noelina remained at the scene. All appeared to be "traumatized." Both officers observed massive blood splatter on the kitchen floor and table.

Winston-Salem Police Detective Russell Lamar Barbee ("Detective Barbee") arrived on the scene at 10:30 p.m. He also observed Felipa's black Honda parked at the foot of the driveway with a shattered driver's side window. As he approached Chepa's house, he

observed several brass shell casings on the front sidewalk and the front porch. More brass shell casings were located just inside the front door. Inside, the wall dividing the living room from the kitchen bore several bullet holes sprayed randomly. The ceiling bore one bullet hole, and another bullet had penetrated a window.

Detective Barbee saw Chepa's body "literally covered in blood." He viewed blood splatter all over the floor and on the walls of the kitchen. Detective Barbee found a spent, deformed bullet laying on the concrete step at the back of the house, near El Flocco's body. The bullet was later identified to have been fired from defendant's gun.

On 12 February 2001, defendant was arrested for the murders of Chepa and El Flocco. The police seized his gun and ammunition that was later identified as the murder weapon. The Grand Jury returned true bills of indictment charging defendant with: (1) two counts of first-degree murder; (2) first-degree kidnapping; (3) robbery with a dangerous weapon; and (4) discharge of a dangerous weapon into occupied property. On 27 January 2003, the Grand Jury returned a superceding indictment in the first-degree murders.

Defendant was tried capitally by a jury at the 24 February 2003 Criminal Session in Forsyth County Superior Court. On 26 March 2003, the jury found defendant to be guilty of: (1) two counts of first-degree murder; (2) first-degree kidnapping; and (3) robbery with a firearm. The jury failed to reach an unanimous verdict on the discharge of a dangerous weapon into occupied property charge, and the State took a dismissal.

Following a capital sentencing hearing and after the jury did not recommend death, defendant was sentenced to two consecutive terms of life imprisonment without parole. Defendant appeals.

## II. Issues

Defendant argues: (1) the short-form indictments are unconstitutional; (2) the trial court erred in: (a) denying defendant's objection to the State's peremptory challenge to strike a juror; (b) denying defendant's motion to suppress a photographic identification and evidence of prior robberies; (c) limiting defendant's cross-examination of a State's witness; and (d) not submitting the charge of involuntary manslaughter to the jury; and (3) defendant was denied his constitutional right to effective assistance of counsel.

STATE v. ALVAREZ

[168 N.C. App. 487 (2005)]

### III. Short-Form Indictments

**[1]** Defendant argues that the short-form murder indictment violated his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and under Article I, §§ 19, 22, and 23 of the North Carolina Constitution. We disagree.

"We have reviewed over fifty additional decisions in which this issue has been raised and rejected by our Supreme Court and this Court in the last three years. These decisions consistently hold that the short[-]form murder indictment is constitutional." *State v. Messick*, 159 N.C. App. 232, 238, 585 S.E.2d 392, 396 (2003), *per curiam aff'd*, 358 N.C. 145, 593 S.E.2d 583 (2004). This assignment of error is summarily dismissed.

### IV. Peremptory Challenge

**[2]** Defendant argues the trial court erred in denying his *Batson* challenge to the State's exercising of a peremptory challenge to remove a prospective African-American juror. We disagree.

Our Supreme Court recently addressed *Batson's* application in *State v. Williams*.

"The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 26 of the North Carolina Constitution prohibit a prosecutor from peremptorily excusing a prospective juror solely on the basis of his or her race. *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986); *State v. Floyd*, 343 N.C. 101, 106, 468 S.E.2d 46, 50, *cert. denied*, [519] U.S. [896], 136 L. Ed. 2d 170 (1996). A three-step process has been established for evaluating claims of racial discrimination in the prosecution's use of peremptory challenges. *Hernandez v. New York*, 500 U.S. 352, 359, 114 L. Ed. 2d 395, 405, 111 S. Ct. 1859 (1991). First, defendant must establish a *prima facie* case that the peremptory challenge was exercised on the basis of race. *Id.* Second, if such a showing is made, the burden shifts to the prosecutor to offer a race-neutral explanation to rebut defendant's *prima facie* case. *Id.* Third, the trial court must determine whether the defendant has proven purposeful discrimination. *Id.*"

355 N.C. 501, 550, 565 S.E.2d 609, 638-39 (2002) (quoting *State v. Lemons*, 348 N.C. 335, 360-61, 501 S.E.2d 309, 324-25 (1998), *sentence*

*vacated on other grounds,* 527 U.S. 1018, 144 L. Ed. 2d 768 (1999)), *cert. denied,* 537 U.S. 1125, 154 L. Ed. 2d 808 (2003).

Here, defendant argues the State's peremptory challenge of a prospective African-American juror was based solely on race. Defendant offered the following evidence to support his *prima facie* case of discrimination: (1) seventy-five percent of prospective African-American jurors were excused; (2) the prospective juror rejected was not distinguishable from a white juror the State selected earlier; and (3) the prospective juror supplied good, "middle of the road" answers on her questionnaire.

The State offered the following race-neutral explanations for its challenge to the prospective juror: (1) her responses on the death penalty questionnaire "were weak;" (2) she admitted that she might develop sympathy towards defendant; and (3) she made a misrepresentation on her juror questionnaire.

Defendant responded to the State's three race-neutral reasons by arguing those reasons were insufficient to distinguish this prospective juror from others the State had selected. First, the juror's hesitancy towards use of the death penalty is a common answer and is "exactly what the law is." Second, although she admitted that she might feel sympathy for defendant, "she was very adamant about . . . being able to set that aside." Third, the State selected a "white, male, twenty-seven-year-old, unemployed, ninth grade dropout" who did not fit the "conservative, employed, educated, members of the community" demographic the State supposedly sought from the jury pool.

The trial court ruled, "there has been no purposeful discrimination proven [and] the explanations given were not pretextual."

The *Williams* Court noted that once the prosecutor offers race-neutral explanations for the peremptory challenges, " 'the only issue for [the appellate court] to determine is whether the trial court correctly concluded that the prosecutor had not intentionally discriminated.' " 355 N.C. at 551, 565 S.E.2d at 638-39 (quoting *Lemons,* 348 N.C. at 361, 501 S.E.2d at 325). As " 'the trial court is in the best position to assess the prosecutor's credibility, we will not overturn its determination absent clear error.' " *Williams,* 355 N.C. at 551, 565 S.E.2d at 638-39 (quoting *Lemons,* 348 N.C. at 361, 501 S.E.2d at 325 (citation omitted)).

Defendant has failed to show "clear error" in the trial court's overruling of defendant's objection. Sufficient race-neutral reasons

for the State's challenge to the prospective juror were presented to comply with *Batson*. This assignment of error is overruled.

## V. Motions to Suppress

**[3]** Defendant contends the trial court erred in denying his motions to suppress: (1) a photographic identification; and (2) evidence of prior robberies. We disagree

### A. Photographic Identification

Our Supreme Court addressed this issue in *State v. Rogers*, where it recognized that determining "[w]hether an identification procedure is unduly suggestive depends on the totality of the circumstances." 355 N.C. 420, 432, 562 S.E.2d 859, 868 (2002) (citing *State v. Pigott*, 320 N.C. 96, 99, 357 S.E.2d 631, 633 (1987)). " 'First, the Court must determine whether the identification procedures were impermissibly suggestive . . . . If so, the Court must then determine whether the [suggestive] procedures created a substantial likelihood of irreparable misidentification.' " *Rogers*, 355 N.C. at 432, 562 S.E.2d at 868 (quoting *State v. Fowler*, 353 N.C. 599, 617, 548 S.E.2d 684, 698 (2001), *cert. denied*, 535 U.S. 939, 152 L. Ed. 2d 230 (2002)) (alteration in original). Our standard of review is to determine whether competent evidence supports the trial court's findings of fact. *Rogers*, 355 N.C. at 433, 562 S.E.2d at 869 (citing *Fowler*, 353 N.C. at 618, 548 S.E.2d at 698).

### 1. Impermissible Suggestiveness

In *Rogers*, our Supreme Court considered the factors in analyzing whether a photographic identification was impermissibly suggestive, including: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty shown by the witness; and (5) the time between the offense and the identification. 355 N.C. at 432, 562 S.E.2d at 868; *see Manson v. Brathwaite*, 432 U.S. 98, 114, 53 L. Ed. 2d 140, 154 (1977).

Here, Felipa identified defendant based on: (1) seeing defendant and recognizing his voice during the attack on the black Honda at El Flocco's apartment; and (2) seeing and hearing defendant at a bar the night before the shooting. Felipa did not see any of the three individuals as they arrived at Chepa's house.

Defendant argues that despite Felipa's recognition of defendant, her photo identification in January 2003 was impermissibly sugges-

tive because: (1) Felipa failed to identify defendant from a similar line-up ten days after the crime; (2) Felipa saw a photo of defendant in a newspaper article discussing the case in February 2001; (3) Felipa saw defendant in court at a bond hearing in May 2002; and (4) Felipa was not completely certain about identifying defendant's photo in January 2003.

Under our standard of review, we hold that competent evidence exists to justify the trial court's denial of defendant's motion to suppress the photographic identification. *See Rogers*, 355 N.C. at 432, 562 S.E.2d at 868 (citing *Fowler*, 353 N.C. at 618, 548 S.E.2d at 698). Although defendant argues several instances that question the validity of Felipa's identification, Felipa's interaction with defendant both on 10 February 2001 and 11 February 2001 supports her identification. She was in the driver's seat of the black Honda when defendant yelled at her to open the door, banged on the window, and shot out the driver's side window. The trial court correctly noted that discrepancies cited by defendant do not render Felipa's identification inadmissible, but are for the jury to weigh and consider in determining Felipa's credibility. This assignment of error is overruled.

## B. Other Crimes

**[4]** Defendant argues the trial court's admission of evidence of other crimes was prejudicial error and requires a new trial. We disagree.

Rule 404(b) of the North Carolina Rules of Evidence states in part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

N.C. Gen. Stat. § 8C-1, Rule 404(b) (2003). The admissibility of 404(b) evidence is "subject to the weighing of probative value versus unfair prejudice mandated by Rule 403." *State v. Agee*, 326 N.C. 542, 549, 391 S.E.2d 171, 175 (1990) (citing *United States v. Montes-Cardenas*, 746 F.2d 771, 780 (11th Cir. 1984)); N.C. Gen. Stat. § 8C-1, Rule 403 (2003) ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of unfair delay, waste of time, or needless presentation of cumulative

evidence."). Rule 404(b) is a rule of inclusion, not exclusion. *Agee*, 326 N.C. at 550, 391 S.E.2d at 175 (citation omitted).

The balancing of these factors lies "within the sound discretion of the trial court, and the trial court's ruling should not be overturned on appeal unless the ruling was 'manifestly unsupported by reason or [was] so arbitrary that it could not have been the result of a reasoned decision.'" *State v. Hyde*, 352 N.C. 37, 55, 530 S.E.2d 281, 293 (2000) (quoting *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988)), *cert. denied*, 531 U.S. 1114, 148 L. Ed. 2d 775 (2001). "[S]uch [404(b)] evidence is relevant and admissible so long as the incidents are sufficiently similar and not too remote." *State v. Blackwell*, 133 N.C. App. 31, 35, 514 S.E.2d 116, 119 (citing *State v. Bagley*, 321 N.C. 201, 207, 362 S.E.2d 244, 247-48 (1987)), *cert. denied*, 350 N.C. 595, 537 S.E.2d 483 (1999); *see also State v. Smith*, 152 N.C. App. 514, 527, 568 S.E.2d 289 ("The use of evidence permitted under Rule 404(b) is guided by two constraints: similarity and temporal proximity.") (citation omitted), *cert. denied*, 356 N.C. 623, 575 S.E.2d 757 (2002).

The State offered evidence concerning the robberies by defendant of Severo Peralta, Marchello Young, and Toledo Leopoldo. All three robberies occurred immediately prior to 11 February 2001, satisfying temporal proximity. Each of the robberies was committed: (1) by Sanchez, Suarez, and defendant; (2) at gunpoint; (3) for money, jewelry, and/or drugs; (4) after the three men discussed robbing individuals to finance their drug trafficking operation involving a gang in Connecticut; and (5) based upon an agreement to divide the loot. The robberies involved Hispanic drug dealers and show a particular *modus operandi* of defendant, Suarez, and Sanchez. Finally, the robberies were interrelated with the murders and kidnapping under a common scheme and purpose.

"Evidence of other crimes or acts" committed by defendant may be admissible under Rule 404(b) if they establish a chain of circumstances or help create a context of the charged crime. *Agee*, 326 N.C. at 548, 391 S.E.2d at 174 (citation omitted). The evidence must enhance the natural development of the facts or be necessary to complete the story of the crime at issue for the jury. *Id.*

Our review of the record and transcript indicate the trial court did not err in permitting the admission of the three robberies. Each was sufficiently similar in how they were committed and occurred within weeks of one another. In addition, the State proffered testimony that

the robberies were all part of a common scheme or plan towards a drug transaction with a Connecticut gang.

We further recognize that prior to the introduction of testimony concerning the robberies, the trial court cautioned and instructed the jury to consider the evidence only for the limited purposes of showing "an alleged common scheme." The trial court again provided this limiting instruction when it charged the jury prior to deliberations.

Defendant has failed to show the trial court abused its discretion in admitting the evidence of the prior robberies. This assignment of error is overruled.

## VI. Limitation of a Cross-Examination

[5] Defendant contends the trial court erred in prohibiting the cross-examination of Suarez concerning pending charges against him. We disagree.

"A witness may be cross-examined on any matter relevant to any issue in the case, including credibility." N.C. Gen. Stat. § 8C-1, Rule 611(b) (2003). Evidence that tends to show that a witness is biased with respect to a party or issue goes to credibility. *State v. Hart*, 239 N.C. 709, 711, 80 S.E.2d 901, 902-03 (1954) (citation omitted). Thus, a party may inquire of an opposing witness "on cross-examination particular facts having a logical tendency to show that the witness is biased against him or his cause, or that the witness is interested adversely to him in the outcome of the litigation." *Id.* (citations omitted). Although the scope of cross-examination is subject to the control of the trial court, *State v. Hosey*, 318 N.C. 330, 334-35, 348 S.E.2d 805, 808 (1986), it may not limit a showing of bias or interest, a recognized substantial legal right. *Hart*, 239 N.C. at 711, 80 S.E.2d at 902-03 (citations omitted).

Here, defendant sought to cross-examine Suarez about his interest in the case. Specifically, defendant inquired whether Suarez was receiving favorable treatment from the State in exchange for his testimony against defendant. Under the North Carolina Rules of Evidence and prior case law, such questioning is permitted to attack the credibility of the witness. *See State v. Graham*, 118 N.C. App. 231, 237-38, 454 S.E.2d 878, 882, *disc. rev. denied*, 340 N.C. 262, 456 S.E.2d 834 (1995). We review the trial court's limitation of this line of questioning under the abuse of discretion standard. *Jones v. Rochelle*, 125 N.C. App. 82, 85-86, 479 S.E.2d 231, 233 (such a ruling will not be disturbed unless it is shown that it was so arbitrary that it could not have

been the product of a reasoned decision), *disc. rev. denied*, 346 N.C. 178, 486 S.E.2d 205 (1997).

Our complete review of the transcript detailing defendant's cross-examination of Suarez shows the limitations imposed by the trial court resulted from N.C. Gen. Stat. § 8C-1, Rule 802 (2003). ("Hearsay is not admissible except as provided by these rules."). The only instances where the trial court sustained objections by the State during defendant's cross-examination occurred after defendant had asked Suarez about third-party statements offered for the truth of the matter asserted. *See Livermon v. Bridgett*, 77 N.C. App. 533, 539-40, 335 S.E.2d 753, 757 (1985) (a statement by one other than the presently testifying witness is hearsay and inadmissible if offered for the truth of the matter asserted), *cert. denied*, 315 N.C. 391, 338 S.E.2d 880 (1986). Defendant fails to show that the State's objections were sustained for any other reason. Other testimony was admitted regarding Suarez's penal interest in defendant's case.

We hold the trial court did not abuse its discretion in limiting defendant's cross-examination of Suarez for hearsay reasons. We further note that in the jury instructions the trial court specifically pointed to the potential bias concerning Suarez's testimony against defendant. Finally, the record did not disclose any voir dire or offers of proof submitted by defendant's counsel following the trial court sustaining the State's hearsay objections of what Suarez's answers would have been. This assignment of error is overruled.

## VII.  Ineffective Assistance of Counsel

[6] Defendant contends his attorneys violated his constitutional rights by twice conceding his guilt during the closing argument to the jury. We disagree.

Our Supreme Court adopted the United States Supreme Court's language in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, *reh'g denied by*, 467 U.S. 1267, 82 L. Ed. 2d 864 (1984), concerning claims of ineffective assistance of counsel. *State v. Braswell*, 312 N.C. 553, 324 S.E.2d 241 (1985). The *Braswell* Court developed a two-part test in considering these arguments:

"First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires

showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."

312 N.C. at 562, 324 S.E.2d at 248 (quoting *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693). In *State v. Harbison*, our Supreme Court determined "that ineffective assistance of counsel, *per se* in violation of the Sixth Amendment, has been established in every criminal case in which the defendant's counsel admits the defendant's guilt to the jury without the defendant's consent." 315 N.C. 175, 180, 337 S.E.2d 504, 507-08 (1985), *cert. denied*, 476 U.S. 1123, 90 L. Ed. 2d 672 (1986).

## A. First Concession

Here, defendant was represented by two attorneys, each of whom made a closing argument to the jury. Defendant's first attorney chronicled the events of 11 February 2001 and described them as a "drug deal gone bad." He argued that defendant, Sanchez, and Suarez went to Chepa's house for a drug transaction. Sanchez and Suarez went to the house, while defendant remained in the car. Defense counsel explained that once the shooting began, he described defendant's situation as: "He's the getaway driver. He's a bad getaway driver because he just left them there." Defendant argues this concession that he was the "getaway driver" was made without his consent and violated his constitutional rights.

The strength of defendant's defense against the charges of first-degree murder, first-degree kidnapping, and robbery with a firearm, was his assertion that the events of 11 February 2001 were a "drug deal gone bad." Defendant asserted no intention of participating in a kidnapping or killing. Rather, he argued that he was the driver, while Suarez and Sanchez attempted to broker a drug deal with Chepa. Defendant testified to and offered further evidence of this argument. Taken in context with counsel's closing argument that all events arose in a "drug deal gone bad," the concession that defendant was the "getaway driver:" (1) related to an intended drug deal, not a murder; and (2) was the crux of defendant's argument throughout trial. This assignment of error is overruled.

## B. Second Concession

Defendant's second counsel continued the argument that the events of 11 February 2001 were not intended to be a kidnapping, robbery, and/or killings. Instead, he argued that everyone went to Chepa's house on Marne Street for a drug transaction. Included in this closing argument was the following excerpt:

I think the whole case really stems from the [State's] allegation that [defendant] and these other people went over there to commit a robbery with a dangerous weapon; that is, to steal a rifle from [Chepa]. I contend to you there's no evidence that [defendant] ever did that, and everything else flows from that. If you find him not guilty of that, I would contend, as a practical matter, although the judge will give you the law, *that you will find him guilty of everything else or not guilty of everything else.*

(emphasis supplied). This language does not amount to a concession of guilt by defense counsel.

Defense counsel argued that Suarez and Sanchez were the "real" perpetrators of the crimes and defendant "was the perfect patsy." The above comment on defendant's guilt merely spoke to the charges involved and the resulting practical implications. There is no reference to or indication of defendant being guilty of the crimes charged.

## C. *Harbison* and *Strickland* Analysis

*Harbison* applies when defense counsel concedes defendant's guilt to either the charged offense or a lesser included offense. *State v. Wiley*, 355 N.C. 592, 619-20, 565 S.E.2d 22, 42 (2002), *cert. denied*, 537 U.S. 1117, 154 L. Ed. 2d 795 (2003). Here, the primary defense to the crimes charged centered on explaining the events as an uncharged drug transaction gone terribly wrong. Both closing argument comments which defendant assigns error to were in the context of that central argument. Neither attorney conceded defendant's guilt to the crimes charged or any lesser-included offense. *See State v. Gainey*, 355 N.C. 73, 92-93, 558 S.E.2d 463, 476 ("counsel merely noted defendant's involvement in the events surrounding the death of the victim"), *cert. denied*, 537 U.S. 896, 154 L. Ed. 2d 165 (2002).

In addition, defendant has failed to show and our review of the record and transcript does not indicate that: (1) defense counsel's performance was so deficient that they were not acting as counsel for defendant; and (2) the deficiencies complained of deprived defendant of a fair trial. *See Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693. This assignment of error is overruled.

## VIII. Lesser-Included Offense

[7] Defendant asserts the trial court erred in not providing the jury an instruction on involuntary manslaughter. We disagree.

Our Supreme Court has held that "when a jury is properly instructed on the elements of first-degree and second-degree murder and thereafter returns a verdict of first-degree murder based on premeditation and deliberation, any error in the court's failure to instruct the jury on involuntary manslaughter is harmless even if the evidence would have supported such an instruction." *State v. Hales,* 344 N.C. 419, 425-26, 474 S.E.2d 328, 331-32 (1996) (citing *State v. Jones,* 339 N.C. 114, 451 S.E.2d 826 (1994), *cert. denied,* 515 U.S. 1169, 132 L. Ed. 2d 873 (1995)); *State v. Hardison,* 326 N.C. 646, 392 S.E.2d 364 (1990); *State v. Young,* 324 N.C. 489, 380 S.E.2d 94 (1989)).

Our review of the transcript shows the trial court properly instructed the jury on: (1) discharging a firearm into an occupied vehicle; (2) first-degree kidnapping; (3) first-degree murder; (4) second-degree murder; and (5) robbery with a firearm. The defendant was found guilty of two counts of first-degree murder, first-degree kidnapping, and robbery with a firearm. The jury found premeditation and deliberation to support first-degree murder and rejected second-degree murder. *See Hales,* 344 N.C. at 425-26, 474 S.E.2d at 331-32. Under our Supreme Court's guidance, presuming the trial court erred in not charging the jury on involuntary manslaughter, defendant's conviction of first-degree murder negated any prejudice to defendant. This assignment of error is overruled.

## IX.  Conclusion

Our Supreme Court and this Court has repeatedly held that the short-form murder indictment is constitutional. The State provided race-neutral reasons for its challenge to an African-American prospective juror. The trial court properly denied defendant's motions to suppress both the photographic identification and Rule 404(b) evidence pertaining to the three prior robberies. Defendant's cross-examination of Suarez was appropriately limited due to defendant's solicitation of hearsay evidence. Defense counsel, in their closing arguments, did not concede defendant's guilt to the crimes charged. Presuming defendant was entitled to an instruction of involuntary manslaughter to the jury, the jury rejected second-degree murder and found defendant guilty of first-degree murder, negating any prejudice to defendant. *Id.*

No error.

Judges WYNN and McGEE concur.