INMAN, Judge.
Defendant Hector Tepox Maldonado ("Defendant") appeals from 13 judgments entered following a jury trial finding him guilty of eight counts of indecent liberties with a child, one count of sexual offense with a child, one count of engaging in a sexual act with a child, one count of rape of a child, one count of statutory rape, and one count of statutory sex offense. Defendant argues that the trial court erred in: (1) closing the courtroom during the victim's testimony; (2) admitting evidence of Defendant's relationships with other minors; (3) allowing expert testimony concerning the victim's treatment for post-traumatic stress disorder ("PTSD"); (4) permitting the prosecutor to make purportedly misleading statements in closing argument; and (5) sentencing Defendant to a minimum of 300 months imprisonment each for three of Defendant's convictions. After careful review, we hold that Defendant failed to preserve his first argument and has not demonstrated reversible error as to the remainder.
I. FACTUAL AND PROCEDURAL HISTORY
The evidence at trial tended to show the following:
Defendant is married to F.M. ("Fiona"),[1] whom he began dating when she was fourteen years old and Defendant was over eighteen. Fiona became pregnant by Defendant and gave birth to a son, HM ("Harry"), before her fifteenth birthday. During this same time frame, Defendant was seeing and had fathered a child with another girl, occasionally living with her and her family.
Defendant moved into Fiona's family home around the time that Harry was born. When Defendant moved in with Fiona and Harry, the home was shared with several members of Fiona's nuclear family: her parents, F.M. ("Fred") and R.S. ("Rhonda"); her brothers, A.M. ("Alex"), J.M. ("Jeff"), and F.M. ("Felix"); and her sisters, J.M. ("Julia") and L.M. ("Lisa"). Eventually, Defendant and Fiona had a second child, who also lived in the home. Fiona and Julia had a particularly close relationship at the time, and Julia would often take care of Fiona's two children while their mother was at work at night. During the course of his relationship with Fiona, Defendant had affairs with two other young women, at least one of whom was in high school at the time. After finding out about the second affair, Fiona temporarily ended the relationship and began seeing another man, though she eventually got back together with Defendant.
Within a year of moving in with Fiona and her family, Defendant began sexually molesting Julia, who was seven years old at the time. Following one such instance of abuse, Julia attempted to call the police, but Defendant took and hung up the phone before Julia could speak to an operator. Julia's aunt, who lived next door but had entered the country illegally, came over and screamed at Julia, discouraging her from calling the police for fear of deportation. The police eventually arrived, were informed the phone call was simply an accident, and departed; Julia was never given a chance to speak with the officers.
Julia, now afraid of calling the police, tried to tell her brother Jeff about the abuse on at least four occasions. Each time, Jeff, who was between ten and eleven years old at the time, encouraged Julia to tell their parents and in one instance said he would do so himself. Neither Jeff nor Julia told their parents at the time, however, because Julia was too afraid of splitting up the family and starting an argument.
Defendant's acts of sexual abuse continued through Julia's time in middle school, eventually escalating to multiple acts of rape while Julia was asleep in her bedroom at night. Still afraid to inform her parents or authorities directly about Defendant's abuse, Julia would instead stay awake and listen for the stairs to her room to creak as Defendant approached; when she heard Defendant, she would call her mother on her cell phone. This was the only means by which Julia managed to avoid further abuse, as any time she failed to hear Defendant approach he would molest or rape her. Julia tried on several occasions to tell Fiona about the abuse indirectly, stating she was afraid of Defendant. Fiona responded each time by telling Julia that her husband was harmless.
In 2014, around the time of Julia's fifteenth birthday, her parents and the rest of her family planned a trip to the beach. Julia told her family that she wanted to go to the beach, but that she refused to travel if Defendant would be going with them. Confused, Julia's mother and Fiona asked her why, and Julia responded by telling them that Defendant had tried to rape her. Fiona refused to believe Julia, and she moved out of the house with Defendant and their children a short time later. The rape ceased once Defendant was out of the home, but Defendant continued to sexually molest Julia whenever she babysat her niece and nephew.
In contrast to Fiona, Rhonda did believe her daughter's account of attempted rape and informed her husband and Lisa. They did not immediately inform law enforcement, however, waiting instead until Julia felt comfortable discussing it with a police officer. Julia eventually met with Detective Jesus Sandoval of the Durham Police Department in 2015, when she disclosed the full extent of the abuse for the first time. That same year, Julia began seeing Whitney Winslow ("Ms. Winslow"), a clinical social worker, for therapy related to her trauma. In the course of treatment, Ms. Winslow diagnosed Julia with PTSD stemming from the abuse.
Defendant was indicted on 17 August 2015 on three counts of first-degree sex offense of a child by an adult offender, eight counts of indecent liberties with a minor, and one count each of first-degree rape of a child by an adult offender, statutory rape, and statutory sex offense. He filed a motion in limine prior to trial, requesting the exclusion of any testimony concerning his "sexual history/relationship with [Fiona,]" partially on the grounds that it constituted evidence of prior bad acts under Rules 404(a) and (b) of the North Carolina Rules of Evidence. The State filed a pretrial motion seeking to close the courtroom during Julia's testimony. Following a brief voir dire examination of Julia, the trial court allowed the State's motion. It reserved a ruling on Defendant's motion in limine until the issue was raised by objection at trial.
The State made no reference to Defendant's affairs in its opening remarks to the jury. Defendant, by contrast, advanced a theory that centered on the close bond between Fiona and Julia and the impact of Defendant's infidelity on the relationship between his wife and his niece. The defense posited that Julia's allegations of sexual abuse and rape arose from her anger at Defendant and Fiona. Defense counsel asserted in opening statement that "[Julia], [Lisa] and the family were very upset at the fact that [Defendant] had an affair, number one, but two, [Fiona] decided to go back to him." As a result, Defendant's counsel reasoned, "these charges are all out of the fact that [Defendant] cheated on [Fiona] and had an affair and that [Fiona] moved back into the house with [Defendant] causing a rift in the family."
Julia was the first witness called to testify; she detailed the abuse she suffered, her close relationship with Fiona, and her attempts to tell Fiona and other members of the family about the abuse. The prosecutor asked no questions about Defendant's extra-marital affairs with anyone other than his abuse of Julia. When the prosecutor asked Julia Fiona's age at the time the abuse began, Defendant raised an objection, which was sustained by the trial court.
In the next break in proceedings, the trial court heard arguments from the parties concerning the admissibility of Fiona's age during her relationship with Defendant in light of Defendant's motion in limine and subsequent objection. The State argued that Fiona's age was admissible to demonstrate "the closeness of this family, why [Fiona's] in the family, that this is [sic] all of her during the time when they're all children and a family together. That's all." The trial court agreed that this contextual information was important while acknowledging that it had a tendency to show propensity for sexual relations with underage girls, and informed counsel that it would permit the State to introduce the evidence only for the former purpose.
On cross-examination, Defendant elicited the first evidence of his promiscuity by asking Julia directly whether she knew he had cheated on Fiona. Defense counsel also asked Julia if the cheating occurred early in the relationship, whether Julia was upset at Defendant for cheating, whether Fiona left Defendant and later returned to him, and if Julia was happy about Fiona dating someone else. The State, on redirect, made further inquiry into Defendant's infidelities. In response to these questions, Julia was permitted to testify over Defendant's objection that she knew Defendant's second affair was with a high school student.
Certain testimony concerning Fiona's age was also admitted. For example, one witness testified that Fiona was born in 1990. After Defendant's counsel objected, the trial court instructed the jury that any ages received concerning any persons other than Julia and Defendant could be used for "showing historical context in this case. ... [N]one of the other ages of any of these people may be used by you for any other purpose." A review of the trial transcript reveals neither Julia nor any subsequent witness testified about the precise ages of the two young women involved in Defendant's extra-marital affairs, though several witnesses were permitted to testify over Defendant's objections that Fiona was fourteen when she and Defendant began dating. Following one such objection, the trial court expressly ruled that evidence of Fiona's age at the time she and Defendant began dating was inadmissible under Rules 403 and 404(b) to show propensity, but that it was admissible for purposes of "historical context[,]" consistent with its earlier instruction to the jury.
The State also called Julia's mother, Rhonda, as a witness, who testified by way of interpreter. Rhonda was asked if Julia ever reported the abuse to her, and she used the Spanish word "molesta" in her answer to the State's questioning. The interpreter interjected, requesting clarification from Rhonda as to whether the word "molesta[,]" as used by the witness, carried a sexual connotation. Rhonda, through the interpreter, made clear in her testimony that the word "molesta" was not being used in any carnal sense, and meant only that Defendant "wouldn't leave [Julia] alone, ... he was arguing with her." The State later asked Rhonda if Julia had ever used the word "molesta" to describe Defendant's actions, and she clarified that while Julia had used that particular word, Rhonda understood it only to mean "annoy" or "to bother[.]"
Ms. Winslow, Julia's therapist, was also among the other witnesses called by the State. Prior to her testimony, the trial court expressed concerns about both Ms. Winslow's qualifications as an expert and the admissibility of her PTSD diagnosis. Following voir dire examination by counsel and a lengthy discussion of applicable case law, the trial court ruled that Ms. Winslow would be permitted to testify: (1) as an expert; (2) to the criteria for diagnoses of PTSD and major depressive disorder ; (3) about Julia's treatment history and any improvements in her wellbeing; and (4) about her observations of and the information relayed to her by Julia. However, the trial court ruled that Ms. Winslow would not be permitted to testify as to any specific diagnoses actually made or whether her observations of Julia and Julia's symptoms were consistent with PTSD. Finally, the trial court agreed to give an instruction to the jury limiting its consideration of Ms. Winslow's discussion of any statements made to her by Julia to corroborative purposes only.
Ms. Winslow's testimony before the jury was broadly consistent with the trial court's ruling, and the trial court gave its limiting instruction. However, Ms. Winslow did testify without objection that Julia "endorsed" symptoms of PTSD before detailing them. Defendant objected on only three occasions during the State's direct examination: (1) when Ms. Winslow testified that Julia reported flashbacks of the abuse; (2) when the State asked if there was a generally consistent way in which minor victims of sexual assault report their abuse; and (3) when Ms. Winslow testified that Julia told her of various attempts to tell her family about the abuse.
After the State's presentation of evidence, Defendant moved to dismiss all charges. The trial court granted the motion as to one count of first-degree sex offense of a child by an adult offender and denied it as to all other charges. The defense began its presentation of evidence immediately thereafter. Fiona testified in her husband's defense. She testified at length about her own observations of Julia and her husband, directly and indirectly contradicting Julia's testimony at various times. She also testified about her relationship with Julia, her husband's various affairs, Julia's reaction to his infidelity, and the nature of Julia's relationship with him. On cross-examination, without objection, Fiona testified about her date of birth and that of her first son by Defendant.
After Defendant and several other witnesses testified, the defense rested and closing arguments proceeded. The State opened its argument by focusing on Julia's efforts to tell her family something was wrong: "[S]he tried to tell and tell and tell. But no one listened and no one understood. Molesta, from the words of the mouth of a seven-year-old." The use of the Spanish word "molesta" was a common refrain throughout the State's closing argument, recounting Julia's testimony "[h]e's bothering me, molesta. And the mother testified she used to call me ... talking about how he was molesta ...." The prosecutor expressly pointed out the connotations of sexual abuse in English:
[Defendant] molesta. That word was used a lot. [Julia] told you she told her mother and her mother told you she called and said [Defendant's] bothering me.
So what happens when we have a dual-language family, that the Spanish word for bother can have a couple of meanings is molesta [sic]? But you have an English-speaking child who grows up and learns the word molest and knows that. ... You have mom who speaks Spanish and doesn't understand.
And so again, it's brushed, just brushed aside.
At no point did Defendant object to these statements.
The jury returned a guilty verdict on all thirteen counts submitted. Defendant was sentenced to seven consecutive sentences of 16 to 20 months imprisonment for indecent liberties with a child, one consecutive sentence of 16 to 29 months imprisonment for indecent liberties with a child, three consecutive sentences of 300 to 372 months imprisonment for two counts of first degree sex offense with a child and one count of first degree rape of a child, and two consecutive sentences of 240 to 348 months imprisonment for one count of statutory rape of a 13/14 year old by a person more than six years older and one count of statutory sex offense of a 13/14 year old by a person more than six years older. Defendant entered notice of appeal in open court.
II. ANALYSIS
Defendant presents five arguments on appeal, contending the trial court erred in: (1) closing the courtroom during Julia's testimony; (2) admitting testimony relating to the ages of Fiona and the two young women with whom Defendant had affairs; (3) permitting Ms. Winslow to testify about certain aspects of her treatment of Julia, purportedly vouching for her credibility; (4) failing to intervene in the State's closing argument when referring to the word "molesta;" and (5) sentencing Defendant to a minimum term of imprisonment greater than that listed in the presumptive range in N.C. Gen. Stat. § 15A-1340.17(c) (2013). After careful review, we hold that defense counsel failed to preserve for appellate review his challenge to the trial court's order closing the courtroom. We reject Defendant's remaining arguments.
A. Closing the Courtroom
Defendant first contends that the trial court committed structural, constitutional error in closing the courtroom during Julia's testimony without making the necessary factual findings mandated by Waller v. Georgia , 467 U.S. 39, 46, 81 L.Ed. 2d 31, 38 (1984), necessitating a new trial. The State asserts that Defendant failed to preserve the issue. We agree with the State.
When the State first moved to close the courtroom, Defendant's counsel stated, "I would note if-with the nature of the offense, Your Honor, [I] necessarily won't object." After a voir dire examination of Julia and argument by the prosecutor, Defendant's counsel did not assert an objection. Instead, counsel reiterated he was leaving the determination to the trial court in its discretion while acknowledging his opinion that closure was not necessary: "It's my opinion, Your Honor, that-like I said, it would be the Judge's discretion. I don't believe it's met that threshold, whether or not to exclude and sequester-close the courtroom to these particular matters, Your Honor." Defendant argues first that he was not required to lodge an objection to preserve structural error based upon this Court's decision in State v. Rollins , 221 N.C. App. 572, 576, 729 S.E.2d 73, 77 (2012), and second that "defense counsel made a challenge to the broad closure ordered by the trial court." This record, however, falls short of the record in Rollins . Although we can infer that, following the voir dire examination of the witness, defense counsel intended to assert an objection to closing the courtroom, we cannot infer that counsel was asserting that closure would violate a constitutional right.
Defense counsel in Rollins expressly stated two key words that are absent from the record here: "we object." Id . at 575, 729 S.E.2d at 76. Furthermore, the structural nature of any alleged constitutional error here necessitates an objection, as "[s]tructural error, no less than other constitutional error, should be preserved at trial." State v. Garcia , 358 N.C. 382, 410, 597 S.E.2d 724, 745 (2004). And unlike trial counsel in Rollins , Defendant's trial counsel repeatedly deferred the decision to close the courtroom to the trial court's discretion. A trial court's violation of a criminal defendant's right to an open trial is reviewed de novo -as are most constitutional challenges-rather than for abuse of discretion. Rollins , 221 N.C. App. at 576, 729 S.E.2d at 76. Because Defendant's trial counsel did not expressly assert any objection, and because he deferred the decision to close the courtroom to the trial court's discretion, we hold that Defendant did not preserve this constitutional challenge for review on appeal.
B. Evidence of Defendant's Relationships
Beyond the closure of the courtroom, Defendant contends that he is entitled to a new trial on the grounds that the trial court impermissibly allowed into evidence the ages of Fiona and the young women with whom Defendant had affairs. Specifically, Defendant argues that the evidence was impermissible evidence of propensity prohibited by Rule 404(b) and more unfairly prejudicial than probative under Rule 403 of the North Carolina Rules of Evidence. We consider whether evidence falls within Rule 404(b)de novo , while we review admissibility under Rule 403 for an abuse of discretion. State v. Beckelheimer , 366 N.C. 127, 130, 726 S.E.2d 156, 159 (2012).
Rule 404(b) begins with the general proposition that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." N.C. R. Evid. 404(b) (2017). Despite this prohibition, "it is a rule of inclusion," Beckelheimer at 131, 726 S.E.2d at 159, and evidence of prior acts "may, however, be admissible for other purposes[.]" N.C. R. Evid. 404(b). One such purpose is "to enhance the natural development of the facts[,]" State v. White , 340 N.C. 264, 284, 457 S.E.2d 841, 853 (1995), and the evidence may be admissible when "necessary to complete the story of the charged crime for the jury." Id. at 284, 457 S.E.2d at 853.
In White , the defendant's stepson died in what was initially ruled an accidental death. Id. at 272, 457 S.E.2d at 845. Nineteen years later, the defendant attempted to hire a man to kill her husband; when the man balked, the defendant said killing someone was "not that hard to do" and told him she had killed her stepson. Id. at 272, 457 S.E.2d at 846. The defendant was later charged with murdering her stepson, and the State called the hesitant hitman to testify about the defendant's conspiracy to kill her husband and her confession to killing her stepson. Id. at 283, 457 S.E.2d at 852. Our Supreme Court held that evidence of the conspiracy to kill the defendant's husband was admissible in her trial for the murder of her stepson, as the defendant's "confession ... would have been difficult to understand without the historical details and context giving rise to the statement. Absent evidence of defendant's relationship with [the reluctant hitman], the jury would have been unable to determine [his] credibility or what weight to give his testimony." Id. at 284, 457 S.E.2d at 853.
Here, the trial court concluded that Fiona's age at the time Defendant began dating her and moved into her family home was admissible for "historical context[,]" in other words, to provide "a complete picture of what occurred ... and why." State v. Rollins , 220 N.C. App. 443, 449, 725 S.E.2d 456, 461 (2012) (upholding the admission of evidence showing the defendant had committed a robbery to explain why he engaged in a police chase that resulted in the death of a motorist). We agree that Fiona's age was admissible for this purpose. Defendant premised his defense on the theory that Julia and her family were vindictively claiming he committed these crimes in retribution for cheating on Fiona. Defendant's counsel asserted to the jury in his opening statement that "[Julia], [Lisa] and the family were very upset at the fact that [Defendant] had an affair, number one, but two, [Fiona] decided to go back to him[,]" with "these charges ... all [arising] out of the fact that [Defendant] cheated on [Fiona] and had an affair and that [Fiona] moved back into the house with [Defendant] causing a rift in the family." Defendant made his relationship with Fiona and her family's reactions thereto central to his defense, and the details of that relationship "enhance the natural development of the facts" and are "necessary to complete the story of the crime at issue for the jury." State v. Alvarez , 168 N.C. App. 487, 497, 608 S.E.2d 371, 377 (2005).
Fiona's age at the time Defendant moved into her home is also relevant to explain Julia's and Fiona's conduct over the years of abuse. Julia testified at length about her close relationship with Fiona, as well as numerous attempts to hint to Fiona that she was being abused by Defendant; his counsel cross-examined her on these very issues, including her delay in fully reporting the abuse and the significant variances between what she told Fiona and what she reported to police. Fiona's many years of involvement with Defendant, starting at a young age, is relevant to how Julia approached disclosing the abuse in light of her relationship with Fiona as her sister and as Defendant's wife. It also tends to explain why Julia's attempts at communicating went unheeded by Fiona. Finally, we note that Fiona herself testified in her husband's defense concerning conduct spanning the whole of their relationship. Fiona's age at the time her relationship with Defendant began is relevant to "the historical details and context" in Julia's indirect and unsuccessful attempts to signal Defendant's abuse, White , 340 N.C. at 284, 457 S.E.2d at 853, and it bears upon the weight and credibility to be afforded Julia and Fiona as testifying witnesses.
Defendant also asserts that the testimony about the ages of the young women with whom he had affairs was inadmissible because "its only tendency was to show propensity toward sexual promiscuity, which is impermissible." We disagree with Defendant for two reasons: first, the ages of the other young women Defendant was involved with were never actually admitted into evidence;[2] and second, Defendant opened the door to evidence concerning "sexual promiscuity" when he made the existence of these affairs central to his defense and elicited evidence of such promiscuity for the first time by asking Julia about Defendant's affairs on cross-examination. See, e.g., State v. Hensley , --- N.C. App. ----, ----, 802 S.E.2d 744, 751 (2017) ("[T]his court has held that, '[w]here ... a party is responsible for "opening the door" with respect to certain evidence, that party may not complain of unfair prejudice resulting from its admission.' " (quoting Everhart v. O'Charley's Inc. , 200 N.C. App. 142, 148, 683 S.E.2d 728, 735 (2009) ) (second and third alterations in original) (additional citations omitted) ).
We also reject Defendant's argument that the trial court abused its discretion in admitting this evidence that it was more prejudicial than probative, in violation of Rule 403. The trial court acknowledged the potential prejudicial effect and, in light thereof, gave the jury an appropriate limiting instruction that "the ages of various people are being introduced into evidence for the purpose of showing historical context in this case. ... [N]one of the other ages of any of these people may be used by you for any other purpose." The trial court weighed the prejudicial effect and probative value of the evidence, ruling that "I find the probative value is outweighed by the danger of unfair prejudice. So the State's motion to admit this evidence is-for those purposes [of showing propensity], is denied. It still comes in only for historical context and we've established that." Between the appropriate limiting instruction "and the trial judge's careful handling of the process, we conclude that it was not an abuse of discretion for the trial court to determine that the danger of unfair prejudice did not substantially outweigh the probative value of the evidence." Beckelheimer , 366 N.C. at 133, 726 S.E.2d at 160.
C. Ms. Winslow's Expert Testimony
Defendant also argues that the trial court erred in permitting Ms. Winslow to testify concerning: (1) the symptoms of PTSD "endorsed" by Julia; (2) her observation of those symptoms in Julia; (3) Julia's reports of flashbacks of sexual abuse; and (4) the ongoing sexual abuse and rape of Julia as the triggering traumatic event. The sum of Ms. Winslow's testimony on these issues, Defendant contends, constitutes an impermissible vouching for Julia's credibility. See, e.g., State v. Bailey , 89 N.C. App. 212, 219, 365 S.E.2d 651, 655 (1988) ("Our appellate courts have consistently held that the testimony of an expert to the effect that a prosecuting witness is believable, credible, or telling the truth is inadmissible evidence."). We disagree.
Of the four topics in Ms. Winslow's testimony challenged on appeal, only one elicited an objection from Defendant's trial counsel. Ms. Winslow testified without objection that: (1) Julia endorsed symptoms of PTSD; (2) she personally observed symptoms consistent with trauma in Julia; and (3) the triggering event was Defendant's ongoing acts of sexual abuse and rape. Because Defendant failed to timely object to this evidence and does not assert plain error on appeal, he has waived any argument concerning its admissibility. State v. Campbell , 296 N.C. 394, 499, 250 S.E.2d 228, 231 (1979). Defendant's only timely objection relevant to the testimony he challenges occurred when Ms. Winslow testified that Julia "said that she would have upsetting images and flashbacks of sexual abuse[.]" Such a statement-a factual recollection of the contents of her conversations with Julia-is simply an observation that in no way vouches for Julia's credibility. See, e.g., State v. Aguallo , 318 N.C. 590, 597-98, 350 S.E.2d 76, 80-81 (1986) (holding that a medical expert's testimony that a minor patient told her she was raped by her stepfather was admissible hearsay but the expert's testimony that she considered the victim "believable" was impermissible opinion testimony). At no point in her testimony did Ms. Winslow state that Julia was believable, that she considered Julia's statements true, or that Julia was a credible witness. Absent such impermissible opinion testimony, we hold that the trial court did not err in permitting Ms. Winslow to testify concerning the symptoms reported by Julia, including the statement that she was suffering from flashbacks to the sexual abuse and rape by Defendant. Id. at 598, 350 S.E.2d at 81.
D. The State's Closing Argument
Defendant further asserts that the trial court erred in failing to intervene during the State's use of the word "molesta" in closing arguments. "The standard of review for assessing alleged improper closing arguments that fail to provoke timely objection from opposing counsel is whether the remarks were so grossly improper that the trial court committed reversible error by failing to intervene ex mero motu ." State v. Jones , 355 N.C. 117, 133, 558 S.E.2d 97, 107 (2002). The impropriety must be "extreme[,]" State v. Richardson , 342 N.C. 772, 786, 467 S.E.2d 685, 693 (1996), meaning "the prosecutor's remarks must have perverted or contaminated the trial such that they rendered the proceedings fundamentally unfair." State v. Mann , 355 N.C. 294, 307-08, 560 S.E.2d 776, 785 (2002). A determination of extremity must be made "in the context in which [the offending comments] were made and in light of the overall factual circumstances to which they referred." State v. Call , 349 N.C. 382, 420, 508 S.E.2d 496, 519 (1998) (citation omitted). Apply the foregoing law, we hold that the prosecutor's closing statements were not so grossly improper as to warrant intervention by the trial court.
Julia testified at trial that she called her mother, Rhonda, at work to try and avoid instances of abuse by Defendant, but that she was always too afraid of him to tell her what was happening despite a desire to do so. Rhonda corroborated this testimony, testifying that Julia would call and say that Defendant was bothering her using the word "molesta." Rhonda did not believe the word carried a sexual connotation in those calls,[3] and Defendant's acts of abuse were not fully disclosed until Julia reported their extent to police years later. From this testimony, the prosecutor argued to the jury in closing that Julia had used the word "molesta" to hint to Rhonda that she was being sexually abused, an implication that her mother never recognized.
"Trial counsel is afforded wide latitude in closing argument and 'may argue all of the evidence which has been presented as well as reasonable inferences' arising from the evidence." State v. Hurd , 246 N.C. App. 281, 294, 784 S.E.2d 528, 537 (2016) (quoting State v. Call , 353 N.C. 400, 417, 545 S.E.2d 190, 202 (2001) ). One could reasonably infer from the testimony elicited from Julia and Rhonda that Julia's use of the word "molesta" indicated sexual abuse, and, when coupled with Julia's attempts to inform her brother Jeff and sisters Lisa and Fiona, was an indirect means of signaling sexual abuse through subtext that went unnoticed by Rhonda. Indeed, Julia testified she had tried to tell Fiona about the abuse indirectly on several occasions. Contrary to Defendant's contention that the prosecutor's closing argument "was designed to appeal to the passions and prejudices of the jury by misleading them about the evidence[,]" the prosecutor's statements merely invited the jury to make an inference suggested by the evidence introduced at trial and do not rise to the level of gross, extreme impropriety rendering the trial fundamentally unfair. Mann , 355 N.C. at 307-08, 560 S.E.2d at 785.[4] Defendant's argument is overruled.
E. Defendant's Sentencing
Defendant asserts that the trial court erroneously entered three presumptive sentences with minimum terms of imprisonment of 300 months, in excess of the 240 month minimum calculated under N.C. Gen. Stat. § 15A-1340.17(c) (2017) for Defendant's B1 felony convictions at Prior Record Level I. As acknowledged by Defendant, however, he was convicted under N.C. Gen. Stat. §§ 14-27.2(A)(1) and 14-27.4(A)(1) (2013), now codified as N.C. Gen. Stat. §§ 14-27.23 and 14-27.28 (2017), respectively. Both of these statutes provide, in relevant part, that a person convicted of these crimes "shall be sentenced pursuant to Article 81B of Chapter 15A of the General Statutes, except that in no case shall the person receive an active punishment of less than 300 months ...." N.C. Gen. Stat. § 14-27.23(b) ; N.C. Gen. Stat. § 14-27.28(b) (emphasis added). Because the statutes under which Defendant was convicted require a minimum sentence of at least 300 months and expressly modify the sentences otherwise applicable to B1 felonies under Article 81B of Chapter 15A, including N.C. Gen. Stat. § 15A-1340.17(c), we reject Defendant's argument that he was sentenced contrary to law.
III. CONCLUSION
Defendant did not preserve for appellate review his argument that the trial court violated his constitutional rights by closing the courtroom during Julia's testimony. The trial court did not err in admitting evidence of Fiona's age at the time she began dating Defendant, as he made Fiona's relationship with himself and with her sister central to his defense, and because that information was relevant to the weight and credibility to be given to Julia's and Fiona's testimonies. As to the existence of other affairs, Defendant opened the door to such evidence by raising them in his opening statement and eliciting it for the first time on cross-examination. The trial court also did not err in permitting an expert witness to testify concerning statements made to her by Julia in the course of treatment where no opinion as to Julia's credibility was expressed. Nor did it err in declining to intervene ex mero motu during the State's closing arguments, as the prosecutor's inferences from the evidence, as presented to the jury, were not grossly improper. We further hold that Defendant was properly sentenced.
NO ERROR.
Report per Rule 30(e).
Judges STROUD and DILLON concur.

We refer to the members of the minor victim's family, with the exception of Defendant, by initials, consistent with the "good practice [of] preserv[ing] the privacy of victims, regardless of age, in appeals from sexual offense cases." State v. Gordon , --- N.C. App. ----, ----, 789 S.E.2d 659, 661 n. 1 (2016). Pseudonyms are used thereafter for ease of reading.

While testimony was admitted showing the young women in the other affairs were in high school, that does not compel the conclusion that they were under the age of consent, as not all high school students are minors. Compare N.C. Gen. Stat. § 14-27.25 (2017) (criminalizing statutory rape as vaginal intercourse with a person 15 years of age or younger and the defendant is at least six years older) with N.C. Gen. Stat. § 50-13.4(c)(2) (2017) (establishing that child support payments terminate at age 18 except "[i]f the child is still in primary or secondary school when the child reaches age 18 ....").

We note that the interpreter sworn in at trial to translate Rhonda's testimony appeared to understand "molesta" as carrying a sexual connotation. When Rhonda first used the word, the translator interrupted on the record to request it be repeated, as it "could be used for two ... purposes." After seeking clarification from Rhonda, the interpreter stated on the record that she had asked her to "explain whether, when you said molested her, you were saying that he bothered her or that he would be doing it in a sexual way."

Defendant asserts in his brief that the trial court openly abdicated its duty to intervene ex mero motu when it told counsel "I'm going to ask you to be listening carefully because I'm not likely to intercede on my own motion unless it's something grossly improper. So unless I hear something grossly improper, I'm going to be listening for an objection." We fundamentally disagree. The trial court explicitly recognized and employed the appropriate standard for sua sponte interruptions from the bench during closing argument. Jones , 355 N.C. at 133, 558 S.E.2d at 107.