IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-403

No. COA20-309

Filed 3 August 2021

Rowan County, No. 16 CRS 2384, 53102-03

STATE OF NORTH CAROLINA

v.

SINDY LINA ABBITT

Rowan County, No. 16 CRS 54029, 54042-43

STATE OF NORTH CAROLINA

v.

DANIEL ALBARRAN

Appeal by defendants from judgments entered 13 March 2019 by Judge Lori I. Hamilton in Rowan County Superior Court. Heard in the Court of Appeals 25 May 2021.

*Attorney General Joshua H. Stein, by Special Deputy Attorney General Sandra Wallace-Smith, for the State.*

*Anne Bleyman for defendant-appellant Sindy Lina Abbitt*

*Rudolf Widenhouse, by M. Gordon Widenhouse, Jr., for defendant-appellant Daniel Albarran.*

TYSON, Judge.

¶ 1     Sindy Abbitt ("Abbitt") and Daniel Albarran ("Albarran") (together: "Defendants") were indicted for the murder of Lacynda Feimster and other crimes related thereto. The jury returned guilty verdicts against Abbitt for first-degree murder on the bases of malice, premeditation, deliberation, and felony murder, attempted robbery with a dangerous weapon, and assault with a deadly weapon. Albarran was convicted by the jury of first-degree felony murder, attempted robbery with a dangerous weapon, and assault with a deadly weapon. We find no error.

## I.     Background

¶ 2     Mary Gregory ("Gregory") lived on Crown Point Drive in May 2016 with her daughter, Lacynda Feimster, ("Feimster") and Feimster's two children: three-year-old Meaco; and, nineteen-year-old NaKyia. Gregory was at home and caring for Meaco when Feimster arrived home from work on 24 May 2016. Feimster had worked at an O'Charley's restaurant, and she had bought juice and diaper wipes at a Food Lion supermarket before returning home between 10:00 p.m. and 11:00 p.m.

¶ 3     Gregory and Meaco were located in the living room and heard Feimster's car arrive in the parking lot. Feimster took longer than usual to come inside the apartment. When Feimster walked into the apartment, a Black female and Hispanic male walked into the apartment behind her.

¶ 4     The male was described as tall, with slicked-back, black hair. He wore a long-sleeved white shirt, jacket, white low top sneakers, and dirty latex gloves. Gregory

described the female as stocky and dark-skinned with shoulder-length hair. She was wearing red tennis shoes and a shirt with a design on the front. Regarding the female's stature, Gregory described her as, "medium, short. She was just average. Not quite average height." Gregory testified she had never seen either the woman or the man with Feimster previously.

¶ 5    After Feimster and the perpetrators entered the apartment, the male locked the front door behind them. Gregory asked Feimster if everything was okay, Feimster replied: "Yes, mama, I got this." Feimster and the female walked directly into Feimster's bedroom and closed the door. Gregory and Meaco remained on the living room sofa with the Hispanic male present.

¶ 6    Meaco eventually went into the bedroom and sat on his mother's lap. Gregory asked the man for his name and where he lived, but he declined to answer. Gregory attempted to call her granddaughter to come and take Meaco away from the apartment, but the man took her cellular flip phone. He told Gregory she could call "when everything was over."

¶ 7    Gregory testified the man was within arms-length away from her, the apartment was "well-lit" and nothing obstructed her view of the man. Gregory testified that while she waited on the sofa, the man paced back and forth. For the duration of the intrusion, the male opened the front door several times to peer outside, and he and the female perpetrator talked about "a phone call."

¶ 8        The man made two or three cell phone calls.  During one of the calls, Gregory testified he said, "She wants to know how far you are.  Where are you? How far away are you?"  After that phone call, the man went to Feimster's bedroom and talked to the female perpetrator.  Gregory was ordered to join them in the bedroom.

¶ 9        Gregory testified the female left the bedroom momentarily.  Gregory saw she had a gun when she returned to the "well-lit" bedroom.  The female hit Gregory in her face with the gun, and she fell to the floor.  Gregory testified, "She told me to stay down.  She said she didn't want to hurt me because I didn't have nothing (sic) to do with it and it didn't have anything to do with me."  Gregory described the gun as small, black, with a brown handle.

¶ 10        Gregory testified when she arose from the floor, Feimster, Meaco and the female were located by the bedroom door.  At some point during the incident, Feimster told the female perpetrator, "If I had it I would give it to you. I don't have any money."  Gregory testified, "The next thing I know [Feimster] and Meaco are down on the floor . . . [Feimster] has got Meaco.  They're in a fetal position and you can't see Meaco."  Gregory explained the female perpetrator had her knee and hand on Feimster, holding her down on the floor.

¶ 11        The female said to Feimster, "Bitch, you should have gave (sic) me the mother f***ing money."  The female perpetrator then shot Feimster in the head and  ran out of the apartment.  Gregory called 911 in hysterics; she was yelling for help and

portions of the call are inaudible. The 911 operator asked, "Did he have a weapon?" Gregory said, "Yes. (inaudible) had a gun and she shot my daughter." The 911 operator recording of a computer-aided dispatch asserted, "Male had a gun and shot the female." The police and EMS arrived. Gregory was transported to the hospital and treated with eight stiches for her broken nose. Meaco was not physically injured.

¶ 12        At trial, forensic pathologist, Nabila Haikal M.D., testified that she performed an autopsy on Feimster on 25 May 2016. Dr. Haikal testified Feimster's life was taken by a gunshot wound to the head, it took minutes for Feimster to die, and she had suffered other injuries suggesting blunt force trauma on the scalp.

¶ 13        Salisbury Police investigators developed a suspect named Ashley Phillips ("Phillips"). Phillips was the first person identified by Feimster's family. A confidential informant identified a car connected to Phillips as being present at the murder scene on 24 May. Phillips came to the police station after the crimes driving this car.

¶ 14        Police officers found a .25 caliber Lorcin pistol and white latex gloves inside the glove compartment of her car. DNA swabs were taken from these items, but they were not submitted for testing. There were also three spent shell casings matching the .25 caliber of the pistol inside the car.

¶ 15        Gregory was shown a photograph of Phillips and said, "she does look like her," referring to the female who had shot Feimster, but the police did not do a

photographic lineup including Phillips' picture.

¶ 16    Inside Feimster's bedroom, a .25 caliber shell casing was found on the floor under Feimster's body. Police also discovered a black drawstring bag in the bedroom with a Taurus revolver inside.

¶ 17    Defense counsel explained to the court that Bureau of Alcohol, Tobacco, Firearms, and Explosives Agent Kevin Kelly ("Agent Kelly") took the .25 shell casing found at the scene and sent it to Jamie Minn ("Minn") along with two shell casings he had test fired himself from the pistol recovered in Phillips' car. Minn received all three shell casings.

¶ 18    Minn was not tendered as a firearms expert at the time of testing, but she examined the shell casings and reported "she could not say it was not the gun used, she also told them there was a likelihood it could be the gun that was used and explained to them how to get further testing that they did not do." The Lorcin pistol and shell casings found in Phillips' car and under Feimster's body produced inconclusive results. The Lorcin pistol was eventually returned to Phillips.

¶ 19    Three days after Feimster was killed, police conducted two photographic lineups with Gregory on 27 May 2016. One lineup involved a photo array of six pictures of males, including a photo of Albarran. Gregory became emotional and visibly upset upon being shown Albarran's photo. She was certain he was the Hispanic male inside of her home and involved in the crimes. The photo lineup was

recorded and played for the jury. The second photographic lineup involved a photo array of six Black females, including Abbitt. Gregory selected Abbitt's picture with certainty as the Black woman who had shot and killed her daughter.

¶ 20    Police officers interviewed Abbitt. She admitted she knew Feimster through her sister but asserted she had not seen her in several years. Abbitt denied being at Crown Point Drive or inside the victim's home on 24 May.

¶ 21    Abbitt claimed, as an alibi, she was home all night at 340 Adolphus Road at a cookout the night Feimster was killed, and other individuals were with her. Abbitt's counsel filed pretrial notice of an alibi defense. None of those asserted individuals were called or testified during trial.

¶ 22    Federal Bureau of Investigation Special Agent Michael Sutton ("Agent Sutton") of the cellular analysis survey division, testified about each of Defendants' cellular phone usage from 23-26 May 2016. Agent Sutton analyzed cell numbers: (704) 645-1373, and (704) 223-7882. The parties stipulated that on or about 24 May 2016, Sindy Abbitt's telephone number was (704) 223-7882.

¶ 23    Salisbury Police Sergeant Travis Schulenburger ("Sergeant Schulenburger") testified Albarran's cellular number at that time was (704) 645-1373. Sergeant Schulenburger testified he had observed a "323" tattoo on Albarran's body. Albarran told him during an interview he had grown up in Los Angeles. The area around Los Angeles is assigned a "323" area code. Albarran stated some people call him "L.A."

¶ 24    The calls Defendants made on 24 May 2016 were relayed by the cell phone towers located at or near the O'Charley's restaurant, the Food Lion supermarket, and Adolphus Road, all of which are located in south Salisbury and in the vicinity of Feimster's apartment.

¶ 25    Agent Sutton testified that on 24 May 2016, from at least 6:09 p.m. to 7:12 p.m., both of Defendants' phones used sectors of towers that provided service to an area that included the 340 Adolphus Road address. No later than 7:32 p.m., Albarran's phone had moved from the south Salisbury location to an area near the O'Charley's restaurant where Feimster had worked. By 10:41 p.m., Abbitt's phone had moved from the area south of Salisbury and used the sector of the cell tower which provided service to an area that included the Food Lion supermarket where Feimster had purchased juice and baby wipes.

¶ 26    Albarran's phone used sectors of towers that provided service to the area that included the Food Lion supermarket and Gregory's apartment at 11:02 p.m., 11:04 p.m. and 11:07 p.m. The sectors used at 11:02 p.m., and 11:07 p.m., had also provided service to the O'Charley's restaurant. On 24 May 2016, by no later than 11:58 p.m., both phones had moved south back to a tower which served an area that included Adolphus Road. There were approximately twelve contacts between the Defendants' two phones from 23 May 2016 through 26 May 2016.

¶ 27    Albarran and Abbitt both denied knowing each another. Abbitt was arrested

on 23 June 2016. Albarran was arrested on 17 August 2016. Gregory identified both Albarran as the male perpetrator and Abbitt as the female perpetrator in open court. The defense requested forensic analysis of a pink cell phone recovered from the coffee table in the victim's apartment. Defense did not request analysis from the Salisbury Police Department for any other items.

Defendants were joined for noncapital trials on 4 March 2019. The jury's verdicts convicted Abbitt of first-degree murder on the bases of both premeditation and deliberation and felony murder, attempted robbery with a dangerous weapon, and assault with a deadly weapon. The jury's verdicts convicted Albarran of first-degree murder on the bases of felony murder, attempted robbery with a dangerous weapon, and assault with a deadly weapon.

Abbitt was sentenced to life without possibility of parole for murder and to concurrent sentences of 73 to 100 months and 150 days for the additional crimes. Albarran was sentenced to life without possibility of parole for the first-degree murder, and to concurrent sentences of 84 months to 113 months and 150 days for the additional crimes. Defendants timely appealed.

## II.    Jurisdiction

These appeals arise from final judgments in a criminal case pursuant to N.C. Gen. Stat. § 7A-27(b) (2019).

## III.    Issues

¶ 31        Six issues are asserted before this Court on appeal. Both parties appeal the trial court's refusal to allow them to introduce evidence to implicate third parties. Albarran also asserts the photographic lineup was suggestive, the trial court erred overruling his objections to the State's assertion he had failed to present evidence, and his counsel's closing argument was flawed.

¶ 32        Abbitt individually challenges the admission of her out-of-court denials of seeing the victim the day of the murder and the sufficiency of the indictment to support the State proceeding on each element of first-degree murder.

## IV.    Refusal to Allow Evidence Implicating Others

¶ 33        Defendants argue the trial court erred by failing to admit relevant evidence tending to show two other people had committed the crimes for which they were charged.

¶ 34        "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C. Gen. Stat. § 8C-1, Rule 401 (2019).

## A. Standard of Review

¶ 35        "Although the trial court's rulings on relevancy technically are not discretionary and therefore are not reviewed under the abuse of discretion standard applicable to Rule 403, such rulings are given great deference on appeal." *Dunn v.*

*Custer*, 162 N.C. App. 259, 266, 591 S.E.2d 11, 17 (2004) (citation and quotation

marks omitted).

> Evidence casting doubt on the guilt of the accused
> and insinuating the guilt of another must be relevant in
> order to be considered by the jury. Because the relevancy
> standard in criminal cases is relatively lax, [a]ny evidence
> calculated to throw light upon the crime charged should be
> admitted by the trial court. However, the general rule
> remains that the trial court has great discretion on the
> admission of evidence. Evidence that another committed
> the crime for which the defendant is charged generally is
> relevant and admissible as long as it does more than create
> an inference or conjecture in this regard. Rather, it must
> point directly to the guilt of the other party. *The evidence
> must simultaneously implicate another and exculpate the
> defendant.*

*State v. Miles*, 222 N.C. App. 593, 607, 730 S.E.2d 816, 827 (2012) (emphasis supplied)

(citations and internal quotation marks omitted) *aff'd*, 366 N.C. 503, 750 S.E.2d 833

(2013).

## B. Trial Court's Findings

¶ 36        The trial court found:

> [S]ome items, specifically, a .25 caliber handgun and latex
> gloves were found somewhere relevant to Ashley Phillips.
>
> That also Ashley Phillips and others were seen arriving at
> the police department in a vehicle that has been forecasted
> to the Court to be similar to an automobile that was
> identified by a confidential informant as being in or around
> the scene of the murder of Ms. Feimster on March 24, 2016
> (sic.)
>
> Also evidence has been presented at trial to indicate that

the two -- the black female and the Hispanic male that were in the apartment on the night of May 24, 2016, were in communication via telephone. One or both of those individuals were in communication via cell phone with other individuals asking questions such as, "Where are you? When are you going to be here," which would -- could create and could be seen as evidence of the involvement of other parties, which to this Court does not -- which to this Court means that there may have been other people involved --could very well have been other people involved at – and one of those people could very, very well have been Ashley Phillips.

 . . . .

[T]he evidence that the defense intends to proffer need to both point directly to the guilt of another person and be inconsistent with the defendant's guilt.

I'm going to find that the proffered -- or the forecasted evidence and the arguments of counsel for the defense failed to meet that second prong. That is, that the evidence would be inconsistent with the guilt of the defendants, and, therefore, I'm going to grant the State's motion in limine to exclude questions or testimony regarding the guilt of another individual.

¶ 37    Neither Defendant proffered evidence tending to *both* implicate another person(s) *and* exculpate either Defendant. *Miles,* 222 N.C. App. at 607, 730 S.E.2d at 827 (emphasis supplied). The proffered evidence merely inferred another person may have been involved in, or assisted in committing the crimes.

¶ 38    Such inferences, if true, were not inconsistent with direct and eyewitness evidence of either Albarran or Abbitt's guilt. *Id.* Albarran failed to show the trial

court's exclusion of the proffered evidence, as not relevant and not admissible, was prejudicial or reversible error. This argument is overruled.

## V. Photographic Lineup

¶ 39    Albarran alleges the photographic array lineup was unconstitutionally suggestive.

### A. Standard of Review

¶ 40    The standard of review to challenge the denial of a motion to suppress a suggestive pretrial identification is whether the trial court's findings of fact are supported by competent evidence, and if the findings of fact support the conclusions of law, which are reviewed *de novo*. *State v. Malone*, 373 N.C. 134, 145, 833 S.E.2d 799, 786 (2019). This Court examines the totality of the circumstances to determine whether an identification procedure was unduly suggestive. *State v. Alvarez*, 168 N.C. App. 487, 495, 608 S.E.2d 371, 376 (2005).

¶ 41    "[A] trial court's evidentiary ruling on a pretrial motion [to suppress] is *not* sufficient to preserve the issue of admissibility for appeal unless a defendant renews the objection during trial." *State v. Oglesby*, 361 N.C. 550, 554, 648 S.E.2d 819, 821 (2007) (emphasis original) (citations omitted). Where this issue is not properly preserved at trial, we review for plain error. *State v. Williams*, 248 N.C. App. 112, 118, 786 S.E.2d 419, 424 (2016).

¶ 42    Under plain error review, a defendant must show a fundamental error occurred

at trial and that, after reviewing the entire record, the claimed error must be so prejudicial justice cannot have been done. *State v. Young*, 248 N.C. App. 815, 823, 790 S.E.2d 182, 188 (2016) (citation omitted). Albarran must show "the error had a probable impact on the jury's finding" and verdict that the defendant was guilty. *Id.* (citations, quotation marks, and brackets omitted).

## B. Analysis

¶ 43    Albarran filed a pretrial motion to suppress the photographic lineup, which the trial court denied. During trial, Albarran objected to testimony about the pretrial identification process, but he failed to object to Gregory's testimony when she identified him as the Hispanic male perpetrator in the courtroom. The issue was not properly preserved for appellant review and is subject to plain error review. *State v. Houser*, 239 N.C. App. 410, 419, 768 S.E.2d 626, 633, *cert. denied*, 368 N.C. 281, 775 S.E.2d 869 (2015).

¶ 44    Albarran argues the photograph of him was substantially different from the other six photographs in the lineup. He asserts the photo was closer to his face than the others and drew attention to him.

¶ 45    "[T]he jury shall be instructed that it may consider credible evidence of compliance or noncompliance to determine the reliability of eyewitness identification." N.C. Gen. Stat. § 15A-284.52(d)(3) (2019). This instruction was provided to the jury by the trial court pursuant to N.C.P.I. - - Crim. 101.15 (2019).

Gregory's courtroom identification of Albarran was of independent origin, based upon what she had experienced and saw up to and at the time of the shooting and during trial. Albarran failed to object, and his statutory and due process rights were not violated. *State v. Malone*, 373 N.C. 134, 135, 833 S.E.2d 779, 781 (2019) (holding eyewitness testimony identifying the defendant in trial after a prejudicial photo lineup was ultimately not a constitutional violation of his rights because the identification "was of independent origin").

Any uncertainty regarding the accuracy, abilities, or credibility of a witness' in-court identification testimony was subject to cross-examination. Any challenge goes to the weight and credibility the trier of fact should consider, rather than to its admissibility. *State v. Billups*, 301 N.C. 607, 616, 272 S.E.2d 842, 849 (1981).

Under plain error review, Albarran has failed to show that the alleged error had a probable impact on the jury. He has failed to establish the error is one that seriously affects the fairness, integrity, or public reputation of judicial proceedings or that a different outcome would have occurred, if excluded. With the unobjected to and in-court identification, the photo identification testimony is not shown to have impacted the jury's verdict. Albarran has failed to establish any prejudice. His argument is overruled.

## VI.    Failure to Present an Evidence Objection

Where the trial court fails to sustain a defendant's objection to the prosecutor's

improper closing argument, this Court reviews that ruling for abuse of discretion. *State v. Martin*, 248 N.C. App. 84, 88-89, 786 S.E.2d 426, 429 (2016) (citing *State v. Jones*, 355 N.C. 117, 131, 558 S.E.2d 97, 106 (2002).

### A. Standard of Review

¶ 50 "Abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *Martin,* 248 N.C. App. at 89, 786 S.E.2d at 429 (internal citations omitted). "When applying the abuse of discretion standard to closing arguments, this Court first determines if the remarks were improper. . . . [I]mproper remarks include statements of personal opinion, personal conclusions, name-calling, and references to events and circumstances outside the evidence, such as the infamous acts of others." *Jones*, 355 N.C. at 131, 558 S.E.2d at 106. This Court also "determine[s] if the remarks were of such a magnitude that their inclusion prejudiced defendant, and thus should have been excluded by the trial court." *Id*.

### B. Analysis

¶ 51 Albarran argues the trial court erred by overruling his objection during the State's closing argument to the prosecutor's improperly commenting on his failure to present evidence. The State's closing argument asserted:

> [Prosecutor]: All right . . . . "Where is it?"
>
> [Defense Counsel]: Objection.

THE COURT: Overruled.

[Prosecutor]: The defense has suggested that value can be found in the evidence . . . in the Salisbury PD evidence locker that has not undergone forensic analysis. They can have the evidence analyzed. Why didn't they have the evidence analyzed? Where is their forensic analysis -- analyst? Again, where is it? Defendant Abbitt gave Sergeant Shulenburger a list of people who would corroborate that she was home all night on May 24 -- 25, 2016. Her attorney predicted in her opening statement that you would hear alibi evidence. Where are these alibi witnesses? And why haven't you heard from them?

Defense counsel objected, stating "we're getting dangerously close to potentially presenting antagonistic defenses." The trial court overruled the defenses' objections, but then stated, "Mr. Albarran did not represent to the jury that he had an alibi defense."

"The State is free to point out the failure of the defendants to produce available witnesses." *State v. Tilley*, 292 N.C. 132, 144, 232 S.E.2d 433, 441 (1977) (prosecutor's remarks directed at the failure of defendants to produce exculpatory evidence or to contradict the State's case did not constitute an impermissible comment on the failure of defendants to take the stand). Abbitt's counsel filed a pretrial notice to assert an alibi defense.

Under these facts relating to Abbitt, the prosecutor's remarks pointing out her failure to produce exculpatory evidence are not impermissible. *State v. Mason*, 315 N.C. 724, 732-33, 340 S.E.2d 430, 435-36 (1986). Here, the prosecutor's statements

do not rise to the level of an improper remark according to *Jones*, 355 N.C. at 131, 558 S.E.2d at 106. Defendant's argument is without merit and overruled. *Id.*

## VII. Defendant's Closing Argument

When the trial court fails to sustain a defendant's objection to the prosecutor's improper closing argument, this Court reviews that ruling for an abuse of discretion. *Martin*, 248 N.C. App. at 88-89, 786 S.E.2d at 429. "Abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *Id.* at 89, 786 S.E.2d at 429 (internal citation omitted).

As noted in the standard of review for section VI, "A lawyer may, however, urge the jury to observe and consider a defendant's demeanor during trial." *State v. Salmon*, 140 N.C. App. 567, 575, 537 S.E.2d 829, 835 (2000) (referencing the defendant in his closing, the prosecutor stated, "[h]ave you seen the slightest bit of emotion? . . . . I haven't seen any. He is a cold fish. He's the kind of individual, when you think about it, you see, who would do exactly what the evidence shows he did.").

Here, the defense's closing argument was as follows:

> [Defense counsel]: [Gregory] was asked about whether or not she noticed any tattoos on the person -- on the individual that she saw in the apartment -- the Hispanic male -- that night. And she said she didn't notice any tattoos. You've had a – a chance to see Daniel Albarran in the courtroom this week - -

[Prosecutor]: Objection, Your Honor.

THE COURT: Sustained.

[Defense counsel]: You have been in this courtroom the entire week. You've had a chance to observe the demeanor of Daniel Albarran, his appearance because you - -

[Prosecutor]: Objection, Your Honor.

THE COURT: Sustained.

[Defense counsel]: -- you obviously have had the opportunity sitting in this courtroom to see Daniel Albarran and to compare his appearance with the description that you've [heard] sic.

[Prosecutor]: Objection, Your Honor.

THE COURT: Sustained.

[Defense counsel]: All right. You heard Detective Shulenburger - - Sergeant Shulenburger testify that the date Daniel Albarran was arrested, he came out of the bedroom putting his shirt on and that had numerous tattoos. He even had tattoos on his neck, and yet Ms. Gregory didn't mention tattoos in her description.

¶ 58 Defense counsel's closing argument asked the jury to discern what Albarran's appearance may have been two years earlier, and to contrast it with what his appearance was at trial, and in his lineup photo.

¶ 59 The prosecutor stated:

[Prosecutor]: And I'll just state for the record, I don't have any problem with his demeanor or whatever. And I didn't have any problem with her asking about tattoos the

> defendant had at the time. The problem is the tattoos that he may have now, two and half years later.
>
> There's no evidence of what tattoos he had then and what tattoos he has now. It's certainly appropriate for her to comment on tattoos that were observed by Sergeant Shulenburger at the time, and that's the reason I objected, Your Honor.

¶ 60   Gregory testified Albarran wore a long-sleeve white shirt and jacket on the night of Feimster's murder, and if he had tattoos on his arms, she would not have been able to see them. The evidence tends to show the photographic lineup of both Albarran and Abbitt was held on 27 May 2016, three days after Feimster was murdered.

¶ 61   Defendants' trial began 4 March 2019, more than two years after the murder. Albarran's photograph used in the array and in the record does not show visible tattoos on Albarran's face and neck.

¶ 62   A change in Albarran's appearance over two years, or even three months, has no bearing on Gregory's identification and description of Albarran on the night of the murder. Based upon the lack of any visible tattoos in Albarran's photograph, shown to Gregory three days after the murder, the trial court did not abuse its discretion sustaining the prosecution's objections. Albarran's argument is overruled.

## VIII.   Abbitt's Out of Court Denials

¶ 63   Abbitt argues her out-of-court statements denying she had seen Feimster

recently were improperly placed into evidence as admissions. "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C. Gen. Stat. § 8C-1, Rule 801(c) (2019). "However, out-of-court statements offered for purposes other than to prove the truth of the matter asserted are not considered hearsay." *State v. Call*, 349 N.C. 382, 409, 508 S.E.2d. 496, 513 (1998). "This Court has held that statements of one person to another to explain subsequent actions taken by the person to whom the statement was made are admissible as non-hearsay evidence." *Id.*

¶ 64     Sergeant Travis testified about a conversation he had with Abbitt, wherein she stated that she had not been to the Crown Point Drive area in over a year, had not seen Feimster in years, she had only known Feimster through Abbitt's sister, she did not know a Hispanic male who goes by the street name of "L.A.," and denied knowing Daniel Albarran at all.

¶ 65     Sergeant Travis testified Abbitt was not in custody or under arrest at the time of this conversation. He had advised Abbitt she did not have to talk to him and was free to leave at any time. After being advised that she could leave at any time, Abbitt willingly spoke to him.

¶ 66     The statements would be relevant and admissible pursuant to N.C. Gen. Stat. § 8C-1, Rule 401 (2019). These statements did not give rise to a reasonable possibility

that without the asserted error, the jury would have reached a different result. Defendant's arguments are without merit and overruled.

## IX. Elements of First-Degree Murder against Abbitt

Abbitt argues her indictment is fatally defective because it does not sufficiently allege the essential elements of the offense. We disagree.

Our Supreme Court stated:

> [T]his Court has consistently held that indictments for murder based on the short-form indictment statute are in compliance with both the North Carolina and United States Constitutions.
>
> This Court has also held that the short-form indictment is sufficient to charge first-degree murder on the basis of any of the theories, including premeditation and deliberation, set forth in N.C.G.S. § 14-17, which is referenced on the short-form indictment.
>
> The crime of first-degree murder and the accompanying maximum penalty of death, as set forth in N.C.G.S. § 14-17 and North Carolina's capital sentencing statute, are encompassed within the language of the short-form indictment. We, therefore, conclude that premeditation and deliberation need not be separately alleged in the short-form indictment.

*State v. Braxton*, 352 N.C. 158, 174-175, 531 S.E.2d 428, 437-38 (2000) (alterations, citations and internal quotation marks omitted). The short form indictment is sufficient to confer jurisdiction upon the courts. *Id*. Abbitt's argument is overruled.

## X. Conclusion

Defendants were properly prohibited from presenting evidence implicating a

third party upon mere speculation, and which evidence did not exculpate their guilt. Albarran did not properly preserve his pretrial objection to the photo lineup on appeal by Gregory's unobjected to in-court identification of him. Defendants' objections during the prosecutor's closing arguments were neither meritorious nor prejudicial. The trial court did not err in sustaining the prosecutor's objections to Albarran's closing argument on his visible tattoos the time of trial.

¶ 70        Abbitt's out-of-court statements were not hearsay. They were relevant and properly admitted. Abbitt's challenge to her indictment is without merit. Both Defendants received fair trials, free from prejudicial errors they together or individually preserved and argued. We find no error. *It is so ordered.*

NO ERROR.

Judge JACKSON concurs.

Judge MURPHY dissents in part and concurs in part with separate opinion.

MURPHY, Judge, dissenting in part and concurring in part.

Evidence implicating others is relevant and admissible when it simultaneously implicates another and exculpates a defendant. Defendants sought to provide such evidence that implicated another person and exculpated themselves. The proffered evidence "constitute[d] a possible alternative explanation for the victim's unfortunate demise and thereby cast[ed] crucial doubt upon the State's theory of the case." *State v. McElrath*, 322 N.C. 1, 13-14, 366 S.E.2d 442, 449 (1988). The trial court erred in precluding Defendants from introducing evidence implicating other suspects.

Further, a "reasonable possibility [exists] that, had the error in question not been committed, a different result would have been reached." *State v. Miles*, 222 N.C. App. 593, 607, 730 S.E.2d 816, 827 (2012), *aff'd per curiam*, 366 N.C. 503, 750 S.E.2d 833 (2013). Defendants are entitled to a new trial, which would render the issues discussed in Parts V through VIII of the Majority moot. As to the validity of the short form indictment discussed in Part IX, I concur.

## BACKGROUND

During the investigation, two suspects other than Defendants were identified—Ashley Phillips and Tim Tim McCain. Phillips is a black woman.[1]

---

[1] McCain's race was not identified by the confidential informant in the police report regarding McCain's involvement in the murder. The trial court referenced the report and stated that the informant "says . . . [h]e saw a black male identified as Tim Tim McCain at the apartment complex minutes before the murder." However, the report only mentions "a black female" and does not mention McCain's race.

Feimster's family initially identified Phillips as a possible suspect, and a confidential informant "stated that he did know that [Feimster's] family was trying to pin the murder on . . . this girl because [she and Feimster were] already beefing." When shown a photograph of Phillips, which was not in a photographic lineup, Gregory stated, "she does look like [the woman who shot Feimster]." Law enforcement investigated Phillips as a suspect, and a confidential informant identified a car, consistent with Phillips' car, at the apartment complex on the day of the murder. When the police searched Phillips' car, they found a .25 caliber Lorcin pistol, and latex gloves inside her car. This combination of items was consistent with Gregory's testimony that the man who participated in Feimster's murder was wearing latex gloves, as well as with her testimony regarding the small size of the gun used to murder Feimster.

¶ 74 Additionally, according to a Salisbury Police Department *Case Supplemental Report*, a confidential informant told law enforcement they saw McCain "at the apartment complex minutes before the murder." The confidential informant stated McCain "was wearing two big coats, was carrying a large looking pistol, and was trying to conceal his face with a white tshirt." This information was consistent with Gregory's testimony that the man who participated in Feimster's murder was wearing a work jacket and a white t-shirt, and her prior statement to an officer at the

hospital that the Hispanic man had a gun.[2]  Furthermore, according to the report, McCain saw the informant looking at him but McCain kept walking.  The informant implied McCain was with a black woman in a car, which was consistent with Phillips' car.  The informant also stated McCain "didn't kill the victim[,] but the [woman] did"; "[McCain] had to call the [woman] to do it because he had been seen."  This information was also consistent with Gregory's testimony that a black woman shot Feimster, and was accompanied by a Hispanic man.

¶ 75     Based on this information, Defendants intended to present evidence that Phillips and McCain committed the crime.  However, on 7 March 2019, the State filed a *Motion in Limine to Preclude Mention of Possible Guilt of Another.*  Over Defendants' objections, the trial court granted the State's motion in limine to exclude questions or testimony regarding the guilt of another.  In granting the State's motion in limine to exclude questions or testimony regarding the guilt of other individuals, the trial court found:

> [S]ome items, specifically, a .25 caliber handgun and latex gloves were found somewhere relevant to Ashley Phillips.
>
> That also Ashley Phillips and others were seen arriving at the police department in a vehicle that has been forecasted to the Court to be similar to an automobile that was identified by a confidential informant as being in or around

---

[2] At trial, contrary to her statement to the officer at the hospital that the Hispanic man had a gun in the apartment the night of Feimster's murder, Gregory testified that she could not remember whether the Hispanic man had a gun.

the scene of the murder of Ms. Feimster on [24 May 2016].

Also evidence has been presented at trial to indicate that the two -- the black female and the Hispanic male that were in the apartment on the night of [24 May 2016], were in communication via telephone. One or both of those individuals were in communication via cell phone with other individuals asking questions such as, "Where are you? When are you going to be here," which would -- could create and could be seen as evidence of the involvement of other parties, which to this Court does not -- which to this Court means that there may have been other people involved --could very well have been other people involved at -- and one of those people could very, very well have been Ashley Phillips.

¶ 76 Throughout the trial, over Defendants' objections, the trial court precluded the presentation of evidence of other suspects implicated in the murder of Feimster. Without hearing such potentially exculpatory evidence, the jury found Abbitt guilty of first-degree murder on the basis of both premeditation and deliberation and felony murder, attempted robbery with a dangerous weapon, and assault with a deadly weapon, and the jury found Albarran guilty of first-degree murder on the basis of felony murder, attempted robbery with a dangerous weapon, and assault with a deadly weapon.

¶ 77 Defendants argue the trial court erred in prohibiting them from offering evidence of the guilt of Phillips and McCain, as evidence regarding whether they were even at Feimster's apartment on the night of the murder was exculpatory.

## ANALYSIS

¶ 78          Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (2019). "The admissibility of evidence is governed by a threshold inquiry into its relevance. In order to be relevant, the evidence must have a logical tendency to prove any fact that is of consequence in the case being litigated." *State v. Holmes*, 263 N.C. App. 289, 302, 822 S.E.2d 708, 720 (2018), *disc. rev. denied*, 372 N.C. 97, 824 S.E.2d 415 (2019). "Trial court rulings on relevancy technically are not discretionary." *Id.* "Whether evidence is relevant is a question of law, [and] we review the trial court's admission of the evidence *de novo*." *State v. Kirby*, 206 N.C. App. 446, 456, 697 S.E.2d 496, 503 (2010). Even though we review relevancy rulings de novo, we give the trial court rulings regarding whether evidence is relevant "great deference on appeal." *State v. Allen*, 265 N.C. App. 480, 489-90, 828 S.E.2d 562, 570, *disc. rev. denied*, *appeal dismissed*, 373 N.C. 175, 833 S.E.2d 806 (2019).

¶ 79          The Majority correctly sets out the rule regarding relevant evidence implicating others:

> Evidence casting doubt on the guilt of the accused and *insinuating* the guilt of another must be relevant in order to be considered by the jury. Because the relevancy standard in criminal cases is "relatively lax," *any evidence* calculated to throw light upon the crime charged should be admitted by the trial court. However, the general rule remains that the trial court has great discretion on the

> admission of evidence. Evidence that another committed the crime for which the defendant is charged *generally is relevant and admissible* as long as it does more than create an inference or conjecture in this regard. Rather, it must point directly to the guilt of the other party. The evidence must simultaneously implicate another and exculpate the defendant.

*Miles*, 222 N.C. App. at 607, 730 S.E.2d at 827 (emphases added) (citations and marks omitted); *supra* at ¶ 35. In *Miles*, we differentiated prior cases, "where alternate perpetrators were positively identified and both direct and circumstantial evidence demonstrated the third parties' opportunity and means to murder," from the defendant's speculative hypothetical that a third party only needed to "step outside her home to murder her husband." *Id.* at 608, 730 S.E.2d at 827. Such a speculative hypothetical did not amount to sufficient evidence to insinuate the guilt of another. *Id.* at 608-09, 730 S.E.2d at 827-28.

¶ 80     While the Majority correctly identifies the rule regarding relevant evidence implicating others, I disagree with its analysis and conclusion that the evidence proffered by Defendants should not have been admitted. The Majority cites the trial court's findings and concludes "[n]either Defendant proffered evidence tending to *both* implicate another person(s) *and* exculpate either Defendant." *Supra* at ¶ 37. According to the Majority, the inferences from the evidence regarding Phillips and McCain were not inconsistent with evidence of either Albarran or Abbitt's guilt. *Supra* at ¶¶ 37-38 ("The proffered evidence merely inferred another person may have

been involved in, or assisted in committing the crimes. Such inferences, if true, were not inconsistent with direct and eyewitness evidence of either Albarran or Abbitt's guilt."). I could not disagree more.

¶ 81 The evidence Defendants offered regarding the guilt of others was highly relevant regarding the possibility of mistaken identification of who was actually in the apartment on the night of Feimster's murder. Specifically, Gregory's statement that Phillips looked like the woman in the apartment and the similarity between the informant's description of McCain and Gregory's description of the man in the apartment, in conjunction with the evidence placing McCain and Phillips at the scene of the crime and evidence implicating McCain and Phillips that was consistent with Gregory's description of the murder, had the potential to cast doubt regarding whether Abbitt or Albarran were the male and female intruders in Feimster's apartment on the night of the murder.

¶ 82 There was strong evidence to inculpate Phillips. In addition to Feimster's family identifying Phillips as a suspect first, Gregory's statement that "[Phillips' picture] does look like [the woman who shot Feimster]," which was not included in a photographic lineup, is highly relevant. The confidential informant implied McCain was with the woman who shot Feimster. When asked specifically whether Phillips, among two others, had anything to do with the murder, the informant responded negatively regarding the two other people, but told the police he "couldn't advise

about [whether Phillips was the woman he saw]." If Phillips was the black woman in the apartment on the night of Feimster's murder, and there was only one female intruder, such evidence would directly exculpate Abbitt. Additionally, other evidence implicated Phillips in Feimster's murder and aligned with Gregory's testimony regarding the small size of the gun and use of gloves. A confidential informant identified a vehicle consistent with Phillips' vehicle at the scene of the crime on the day of the murder, and a .25 caliber Lorcin pistol and latex gloves were discovered inside Phillips' vehicle. Further, Gregory testified the Hispanic man "had on latex gloves[.]"

¶ 83      Gregory's statement regarding Phillips looking like the woman who killed her daughter, and Feimster's family's suspicion of Phillips, taken with the other evidence found in Phillips' vehicle and the informant's statements in the police report, raises more than a mere inference that Phillips may have been involved in Feimster's murder. Rather, it "constitute[s] a possible alternative explanation for the victim's unfortunate demise and thereby casts crucial doubt upon the State's theory of the case." *McElrath*, 322 N.C. at 13-14, 366 S.E.2d at 449. This evidence was not only relevant, but pointed directly to the guilt of Phillips while exculpating Abbitt. *See Miles*, 222 N.C. App. at 607, 730 S.E.2d at 827.

¶ 84      The case of *State v. Israel* further undermines the Majority's reasoning. *State v. Israel*, 353 N.C. 211, 539 S.E.2d 633 (2000). In *Israel*, "the jury was not permitted

to hear" evidence from the defendant regarding the victim's fear of her ex-boyfriend, as well as evidence the ex-boyfriend had been seen at the victim's apartment complex "twice during the *week* of the murder." *Id.* at 215, 539 S.E.2d at 636 (emphasis added). Our Supreme Court reasoned:

> [The ex-boyfriend] had both the opportunity to kill her—pictured as he was on the surveillance videotape entering and leaving the victim's apartment [within a day of the estimated time of death]—and, given his history with the victim, a possible motive. . . . [A]mple evidence supported [the defendant's] recent interaction with the victim. Equally ample was excluded evidence of [the victim's ex-boyfriend's] own recent interaction with [the victim], and the history of his dealings with her point to more sinister motives than any left behind in [the] defendant's fingerprints or personal effects.

*Id.* at 219, 539 S.E.2d at 638.

¶ 85        The offered evidence similarly placed Phillips at the scene of the crime as the confidential informant indicated Phillips' vehicle was at the apartment complex "minutes before the murder" and that a black woman was with McCain.[3] While the offered evidence regarding Phillips does not provide a specific motive, the victim's family's suspicion of Phillips as a suspect, as well as the informant's statement that the female with McCain was "already beefing" with Feimster, could have provided a potential motive for Phillips to harm Feimster, similar to the ex-boyfriend in *Israel*.

---

[3] Although the informant's statement explicitly referenced McCain, it clearly contemplated the woman McCain was with at the apartment at the same time as McCain.

The informant's statements in the report potentially places Phillips at the scene of the crime at a time more proximate to the crime than the ex-boyfriend in *Israel* and casts doubt on the accuracy of Gregory's testimony.

¶ 86       Further, Gregory claimed she was not shown a picture of Phillips, in the photographic lineup or otherwise. However, Defendants intended to offer evidence that Gregory initially identified Phillips as looking like the woman in the apartment on the night of the murder to impeach Gregory's recollection of the individuals in the apartment on the night of the murder. The trial court prevented Defendants from presenting evidence that would have fit the exact definition of impeachment regarding Gregory's testimony. "The primary purpose of impeachment is to reduce or discount the credibility of a witness for the purpose of inducing the jury to give less weight to his testimony in arriving at the ultimate facts in the case." *State v. Bell*, 249 N.C. 379, 381, 106 S.E.2d 495, 498 (1959) (quoting *State v. Nelson*, 200 N.C. 69, 72, 156 S.E. 154, 156 (1930)). "Impeachment evidence has been defined as evidence used to undermine a witness's credibility, with any circumstance tending to show a defect in the witness's perception, memory, narration or veracity relevant to this purpose." *State v. Gettys*, 243 N.C. App. 590, 595, 777 S.E.2d 351, 356 (2015) (quoting *State v. Allen*, 222 N.C. App. 707, 721, 731 S.E.2d 510, 520, *disc. rev. denied, appeal dismissed*, 366 N.C. 415, 737 S.E.2d 377 (2012), *cert. denied*, 569 U.S. 952, 185 L. Ed. 2d 876 (2013)), *disc. rev. denied, appeal dismissed*, 368 N.C. 685, 781 S.E.2d 798

(2016). As Defendants argued at trial, the proffered evidence, "in the jury's eye[,] [had the potential to] call into question the reliability of the description[s] that [at] different times were given by Ms. Gregory." Consequently, the evidence implicating Phillips was also relevant to impeach Gregory's testimony or cause the jury to question her testimony at trial.

¶ 87    The trial court's exclusion of this evidence significantly curtailed both Defendants' cases. The State built its case on the fact that if one Defendant was guilty, the other was guilty.[4] For example, the State introduced evidence of Defendants' cell phone records, showing they had been in contact the day of the crime. However, if Defendants were able to introduce evidence that Phillips was the black woman in the apartment on the night of the murder, thus exculpating Abbitt, this would have also weakened the State's case that Albarran was the Hispanic man in the apartment on the night of Feimster's murder.[5]

> '[T]he twofold aim of criminal justice is that guilt shall not
> escape or innocence suffer.' We have elected to employ an
> adversary system of criminal justice in which the parties
> contest all issues before a court of law. The need to develop
> all relevant facts in the adversary system is both

---

[4] In response to the State's motion in limine seeking to exclude evidence regarding the possible guilt of another, Albarran acknowledged the State's tactic in arguing that the State's case was "if one is guilty[,] the other is guilty."

[5] For instance, if Phillips was the black woman in the apartment on the night of the murder, and not Abbitt, Albarran was not the Hispanic man in the apartment. Additionally, if McCain was in the apartment that night, and not Albarran, then Abbitt was not the black woman in the apartment that night.

> fundamental and comprehensive. The ends of criminal
> justice would be defeated if judgments were to be founded
> on a partial or speculative presentation of the facts. The
> very integrity of the judicial system and public confidence
> in the system depend on full disclosure of all the facts,
> within the framework of the rules of evidence.

*United States v. Nixon,* 418 U.S. 683, 709, 41 L. Ed. 2d 1039, 1064 (1974) (quoting

*Berger v. United States*, 295 U.S. 78, 88, 79 L. Ed. 1314, 1321 (1935), *overruled on*

*other grounds by Stirone v. United States*, 361 U.S. 212, 4 L. Ed. 2d 252 (1960)).

Defendants' proffered evidence was of great consequence to the pursuit of the truth

as to who killed Feimster.

¶ 88        Albarran also desired to introduce evidence that someone else, namely McCain,

may have committed the crimes. The confidential informant implied that McCain

was at the apartment complex with a black woman minutes before the murder.

Consistent with Gregory's testimony, the informant said McCain did not kill

Feimster, but the black woman with McCain did. The informant also stated McCain

was wearing "two big coats," "was trying to conceal his face with a white tshirt," and

was carrying a gun. Similar to the informant's statement, Gregory described the man

as wearing a white t-shirt, latex gloves, and a work jacket, and as carrying a gun.

¶ 89        In granting the State's motion in limine, the trial court stated "I don't see that

this confidential informant [who identified McCain and a black woman at the

apartment] provides any information that would make me reconsider my ruling." The

trial court, and now the Majority, have not properly considered the relevancy of the evidence that implicated others, exculpated Albarran and Abbitt, and further impeached Gregory. In *Israel*, the victim's ex-boyfriend was seen at the victim's apartment complex "twice during the *week* of the murder." *Israel*, 353 N.C. at 215, 539 S.E.2d at 636 (emphasis added). Here, McCain was seen at the apartment complex with a gun *minutes* before the murder.[6]

¶ 90      Additionally, Gregory's initial identification of Phillips as looking like the woman in the apartment on the night of Feimster's murder, and the other evidence implicating Phillips, similarly undermines Gregory's identification of Albarran, as Gregory may have also been mistaken about Albarran, rather than McCain, being in the apartment that night. Defendants had the right to impeach by offering evidence

---

[6] I note our Supreme Court's opinion in *State v. Williams*, where the defendant sought to introduce evidence that three others may have committed the murders he was accused of. *State v. Williams*, 355 N.C. 501, 532, 565 S.E.2d 609, 627 (2002), *cert. denied*, 537 U.S. 1125, 154 L. Ed. 2d 808 (2003). In rejecting the defendant's arguments, our Supreme Court held "there was no evidence to indicate that [the first suspect] had committed this crime except for his proximity to the crime scene." *Id.* at 533, 565 S.E.2d at 628. Here, McCain was not only in close proximity to the crime scene, within minutes of the murder, but additional evidence indicated he committed the crime. The informant stated McCain was seen with a gun, two coats, a white t-shirt (trying to conceal his face from identification), and implied he was with a black woman in a car that matched Phillips' car. Similarly, Gregory described the man in the apartment on the night of the murder to be wearing a work jacket and a white t-shirt, and to be carrying a gun. Consistent with Gregory's testimony, the informant stated McCain did not kill the victim; rather, the woman did at McCain's request. Accordingly, McCain was not only in close proximity to the crime, like the suspect in *Williams*, but Defendants were also prepared to offer additional evidence indicating McCain committed the crime.

of Gregory's prior inconsistent statements or dishonesty. *See State v. Anderson*, 88 N.C. App. 545, 548, 364 S.E.2d 163, 165 (1988) (marks and citation omitted) ("[I]mpeachment is an attack upon the credibility of a witness, and is accomplished by such methods as showing the existence of bias; a prior inconsistent statement; untruthful or dishonest character; or defective ability to observe, remember, or recount the matter about which the witness testifies.").

¶ 91 The trial court concluded that Defendants' evidence merely implicated the involvement of other parties, making any evidence regarding McCain and Phillips not exculpatory, because one or both of the Defendants was talking on the phone asking questions, including, "Where are you? When are you going to be here[?]" The Record lacks evidence linking the four–Phillips and McCain with Abbitt and Albarran–by phone or otherwise. The trial court's grant of the State's motion in limine excluded the evidence underlying Defendants' key exculpatory theory of mistaken identification, and instead assumed a connection between Defendants and any other potential perpetrators, without sufficient evidentiary support. The evidence of other suspects had the potential to negate Defendants' involvement in the crime if the intrusion into Feimster's apartment and her murder were committed by Phillips and/or McCain.

¶ 92 The following evidence was potentially exculpatory to Abbitt: Gregory's statement that Phillips looked like the person who shot Feimster; the discovery of a

potential murder weapon and latex gloves consistent with the crime in Phillips' car; a car consistent with Phillips' car being at the scene of the crime; and the report that a woman with McCain committed the murder. This evidence points to one black female intruder, Phillips, in Feimster's apartment that night, which would exculpate Abbitt from Feimster's murder. The following evidence was potentially exculpatory to Albarran: an informant placing McCain at the apartment complex minutes before the murder; the consistent identification of a male in a white t-shirt and coat with latex gloves; and the connection of McCain with Phillips in conjunction with the evidence inculpating Phillips. This evidence also points to one male intruder, McCain, in Feimster's apartment that night, which would exculpate Albarran from Feimster's murder. Consequently, the trial court erred in precluding Defendants from introducing such evidence.

¶ 93    "When the trial court excludes evidence based on its relevancy, a defendant is entitled to a new trial only where the erroneous exclusion was prejudicial." *Miles*, 222 N.C. App. at 607, 730 S.E.2d at 827. "A defendant is prejudiced by the trial court's evidentiary error where there is a 'reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises.'" *Id*. (quoting N.C.G.S. § 15A-1443(a) (2011)). "[The] [d]efendant bears the burden of showing prejudice." *Id*. Here, Defendants have shown a reasonable possibility that the jury would have reached a different

result if the trial court had admitted the evidence implicating Phillips and McCain, as this evidence would have exculpated Defendants and the only evidence directly connecting Defendants to the crime was Gregory's identification of them, which would have been undermined by her impeachment.

## **CONCLUSION**

Defendants sought to introduce exculpatory evidence regarding the involvement of two different suspects in the murder of Feimster. This relevant evidence simultaneously implicated others and exculpated Defendants. Further, it impeached the State's key witness. The trial court should not have granted the State's motion in limine to exclude questions or testimony regarding the guilt of another, and, had the trial court's evidentiary error not occurred, a different result was reasonably possible. Defendants are entitled to a new trial, and, other than the validity of the short form indictment, the remaining issues on appeal are moot. I respectfully dissent.